# WATKINS *et al. v.* WATKINS *et al.**

(Division A. Jan. 4, 1926. Suggestion of Error Overruled Feb. 1, 1926.)

[106 So. 753. No. 24804.]

1. WILLS. *Special issues considered together, in light of instructions, held sufficient in form.*

   Special issues, in suit to establish claimed lost holographic will, when considered together, in light of instructions, *held* sufficient in form.

2. WILLS. *Peremptory instructions on issues of execution and undue influence properly granted.*

   In view of clear and uncontroverted testimony on first issue, and absence of testimony on the other, complainants, in suit to establish lost will, *held* properly granted peremptory instructions on issues of execution of will and undue influence.

3. WILLS. *Use of "last" in peremptory instruction on certain issues held not to foreclose other issues.*

   Use of word "last" in connection with "will and testament," in peremptory instructions for complainants, in suit to establish last will, on issues of execution of will and undue influence, *held*, especially in view of many charges given, not to foreclose other issues—of correctness of claimed copy, and revocation while testator was competent.

4. WILLS. *Presumed destroyed animo revocandi, where traced to testator, and not found after death.*

   Where will is traced to testator's possession, and cannot be found after his death, it is presumed he destroyed it *animo revocandi.*

5. WILLS. *Presumption of destruction animo revocandi overcome by showing existence after permanent incapacity.*

   Presumption of destruction of will by testator *animo revocandi,* may be overcome by proof that it was in existence after he became permanently incapacitated to revoke.

6. WILLS. *Same degree of mentality necessary for revocation as for making.*

   Same degree of mentality is necessary for revoking as for making will.

7. WILLS. *Burden of showing lack of capacity to revoke on party seeking to establish lost will.*

   Complainants, seeking to establish claimed lost will, have burden of showing testator never had mental capacity to revoke after will was last shown to have been in existence.

8. WILLS. *Notwithstanding transcript, in view of entire testimony, witness held not to have said will was typewritten.*

   In view of entire testimony of witness, in suit to establish claimed lost holographic will, *held*, it was manifest that he did not in one place say, as transcribed in the record, that the will shown him by testator was typewritten.

9. WILLS. *Evidence of lack of capacity to revoke sufficient for jury.*

   Evidence of diseased condition of testator's mind *held* sufficient to go to jury, on issue of lack of capacity to revoke.

10. WILLS. *Verdict on conflicting evidence, approved by chancellor, not disturbed.*

    Verdict on conflicting evidence, finding want of capacity to revoke will, being approved by chancellor, cannot be disturbed on appeal.

11. WITNESSES. *Physician cannot disclose deceased patient's communication.*

    Under Code 1906, section 3695 (Hemingway's Code, section 6380), physician cannot testify to patient's communication, without his consent, and so not after his death.

12. WITNESSES. *Testimony of physician, as expert, to hypothetical question not objectionable on ground of privilege.*

    Testimony of physician, as an expert, in answer to hypothetical question, based on testimony of lay witnesses, as to mental capacity of testator, is not objectionable on ground of privilege, though witness had, at a time prior to that in question, been testator's physician.

13. APPEAL AND ERROR. *Decree, based on verdict, not disturbed, unless manifestly wrong.*

    It being impossible to say with confidence that verdict is against overwhelming weight of evidence, or that decree based thereon is manifestly wrong, decree will be affirmed.

---

*Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., p. 876, n. 71. Wills, 40 Cyc., pp. 1004, n. 4; 1171, n. 39; 1281, n. 8; 1283, n. 10; 1325, n. 91; 1326, n. 93 New; 1332, n. 46, 50; 1333, n. 56 New; 1334, n. 63 New; 1359, n. 76. Witnesses, 40 Cyc., pp. 2381, n. 27; 2388, n. 77; 2389, n. 88; 2397, n. 64; 2405, n. 15; Presumption as to revocation of missing will, see notes in 38 L. R. A. 433; 50 L. R. A. (N. S.), 864; 28 R. C. L.,

p. 384; 5 R. C. L. Supp., p. 1534; Power of one lacking testamentary capacity to revoke will, see note in 18 L. R. A. (N. S.) 99; 28 R. C. L., p. 168.

Appeal from chancery court of Monroe county.

Hon. Allen Cox, Chancellor.

Suit by W. B. Watkins, executor, and others, against Mrs. Josephine C. Watkins, individually and as administratrix, and others. Decree for complainants, and defendant appeals in her two capacities. Affirmed.

*Leftwich & Tubb* and *McIntyre & Roberds,* for appellants.

I. The lower court erred in refusing to permit Dr. J. W. Coleman to testify as a physician as to the condition of Wade Leroy Watkins' mind as he found it while attending Watkins as his patient. See section 6380, Hemingway's Code. New York was the first state to enact a statute establishing the privilege, and following New York, Missouri came next, and now a majority of the states have such statute establishing the privilege. *Fox* v. *Union Turnp. Co.* (N. Y.), 69 Supl. 551. This holding of the supreme court of New York is to the effect that the statute is not inflexible; this, too, when the evidence of the physician would contradict and reflect on the credibility of the patient. See also 4 Wigmore on Evidence, 2388. ''The right to waive a privilege must be as broad as the privilege itself.'' *Blair* v. *Chicago & A.. R. R. Co.,* 89 Mo. 334; *Olson* v. *Court of Honor,* 100 Minn. 117, 8 L. R. A. (N. S.) 521. If the only heir and legal representative of the deceased cannot waive the privilege while adversaries can invoke the statute to suppress the truth and defeat the rights given her as the wife of deceased, under the laws of this state, then great injustice is done her. 4 Wigmore on Evidence, 2389; *Epstein* v. *Penn. R. R. Co.* (Mo.), 48 L. R. A. (N. S.) 394.

Here the proponents go on the witness stand before a jury and crowded court room and say the deceased

was insane for more than two years before his death, and say that he was being treated by physicians. Then they can cry, "secrecy, secrecy!" when there is no secrecy, and by so crying prevent from testifying the one man capable of intelligently testifying and giving the real facts when his testimony will clear the deceased of the stigma placed upon him by the proponents in this case.

We have gone over the different cases, some ten or twelve of them, in which this court has been called upon to construe or pass upon this statute, and we have been unable to find a single one of them where this identical question was presented to the court; and in this case we insist that the reason for the rule does not exist; for, as said above, this witness, who was the attending physician, is not called upon to divulge anything that would reflect in the least upon the character or standing of the deceased; but is called upon to state the facts as he found them, and these facts known by the physician would, on the contrary, reflect credit upon the deceased; and had he been permitted to testify as a physician, he would have said that, in his judgment, from a study of the patient's physical and mental condition, that he was sane. From a casual reading of the case of *McCaw et al.* v. *Turner, et al.,* 126 Miss. 260, it might appear that our court has passed upon this identical question, but a study of this case will show that such is not true.

II. *The issues submitted to the jury by the court's decree making up the issues*: Assignments of Error 1 and 2 assail the form of the issues which were submitted to the jury in the trial of this cause. See section 1662, Hemingway's Code; section 1997, Code of 1906. As these issues submitted to the jury are the only pleading that they may consider, their verbiage is unusually important. *Payne* v. *Banks,* 32 Miss. 292.

It is said by a leading author that the issues submitted to the jury must be such as to leave the court no office but to declare for or against the will. 3 Alexander on Wills, 1332-1333. It has been further held that the is-

sues joined should be issues of fact strictly. *Comstock* v. *Hadlyme Ecclesiastical Society,* 20 Am. Dec. 100-101. See also 40 Cyc. 1325; 11 Ency. Pl. & Pr. 662, 663, 668 and 669; *Kerr* v. *Lunsford,* 2 L. R. A. 668 and note.

As stated in the last text cited and the other authorities, these issues should be in language not technical, not obscure, but in plain language easily understood by laymen and easy to be read and comprehended. In view of these principles we bring the attention of the court to the issues framed by the court below and submitted to the jury. Take the first issue: "Did Wade Leroy Watkins make, publish and declare his last holographic will and testament in or about the month of June, 1918?" We submit that the language here is technical, especially in the use of the word *"holographic."* It asks the jury to find a conclusion of law rather than one of fact and its language is not easily understood by the plain men who form the jury. On the other hand, the language is calculated to cloud and confuse the issue to be decided.

Each and every one of the issues propounded is improper and assumes as an ultimate fact already established what was charged in the bill and definitely denied in the answer, that the paper propounded was not executed as and for the last will and testament of Mr. Watkins and never existed as such and that if it did exist as such it was by him revoked when competent to do so. This court in *Kell* v. *Rogers,* 28 Miss. 83, has held that the duty rested upon the court himself to make up the issues to be submitted to the jury. These issues must be made up from the pleadings and they must be issues of fact and not issues or conclusions of law and the authorities we have cited are all to the effect that courts in framing them are admonished to use plain, untechnical language and language that doesn't beg the question and language that doesn't anticipate by its suggestive qualities the result that should be attained in the investigation.

III.  *The peremptory charges asked and given the proponents on the first and second issues submitted to the jury*:  Assuming for argument's sake that these charges were justified by the proved facts, then they are altogether improper; for by their very terms and implications they foreclose the whole case and in the minds of a jury of laymen leave them nothing to decide.  A will is ambulatory, subject to change and revocation until the last breath of a sane man.  Many things are involved affecting its validity in this large record and yet the court characterizes the document as "the last holographic will and testament" of Mr. Watkins, assuming all the preliminary facts to be proved and the presumption that he revoked it not to exist.  This charge, taken in connection with the first issue, and almost in the same language, was calculated to mislead and, no doubt, did mislead the jury and was destructive of the contestant's case before the jury, leaving a jury of laymen to understand that the court had terminated all questions and left nothing for them to pass upon.

In all jurisdictions, both in civil and criminal cases, the rule is that instructions which assume the existence of material facts in dispute are erroneous as invading the province of the jury and such instructions are always properly refused.  1 Randall's Instructions to Juries, 127, sec. 74; *Reed* v. *Yazoo & M. V. R. R. Co.,* 94 Miss. 639, 47 So. 670; *Griffin* v. *Griffin*, 93 Miss. 651; *Coleman* v. *Adair,* 75 Miss. 660, 23 So. 369; *Scally* v. *Wardlaw,* 123 Miss. 857; 11 Ency. Pl. & Pr. 116, and cases cited therein.

Of course, the rule of law we are invoking will not be disputed and the only matter is its application, and its application, it seems to us, is undoubted.  These two charges were theoretically intended to apply only to issues one and three submitted to the jury, but the language employed is so comprehensive that no jury of laymen unaccustomed to making discriminating distinctions could have done less than conclude that the court had made up his mind on these issues.  In stating his o-

pinion on those two issues and instructing the jury as to them to find favorable to the proponents he used language broad enough to take in the whole case.

IV. *Revocation of the alleged will.* We submit such fragmentary and contradictory testimony as that of witness Hill is not sufficient to validate and establish the will; but let us assume for argument's sake that all of what Hill says is true and that the jury believes him, then the most that can be established by his testimony is that the alleged paper sought by proponents to be established as the will of Wade Leroy Watkins, written by him in his own handwriting about June, 1918, was in the pocket of Wade Leroy Watkins and was taken out of his pocket on the street in Aberdeen, in front of the Western Union Telegraph office, and shown to J. H. Hill. If Hill's statement is taken in its entirety and in its integrity, it not only proves the existence of the will at that time and for the last time in its history, but the very statements and observations made to him by the testator at the time he exhibited the will show all the capacity necessary to be possessed by him to revoke it.

That the alleged will was lost is shown by very diligent search made for it by all the parties interested and is beyond question and must be admitted. The burden of the proof accordingly rests upon the proponents throughout not only to prove by clear, satisfactory and convincing proof the proper execution of the will, but they must account for its absence and overcome the presumption that the testator destroyed the will *animo revocandi.* 28 R. C. L. 384-385; *In re Colbert,* 31 Minn. 461, 107 Am. St. Rep. 439, 3 Ann. Cas. 952. The same authorities put the proposition in this form, if the will is traced to the possession of the testator and is not found among his valuable papers at his death, the law raises the presumption that he destroyed it *animo revocandi.* 28 R. C. L., pp. 172, 390, 384, 385; 1 Alexander on Wills, 747, sec. 550 and cases; 3 Alexander on Wills, p. 2012 and note; *Clark* v. *Turner,* 50 Neb. 200, 38 L. R. A. 433 and note; *Re Francis,* 94 Neb. 144, 40 L. R. A. (N. S.) 861

and note, see especially cases assembled at p. 864; *Scott v. Maddox,* 113 Ga. 795, 84 Am. St. Rep. 263 and note; *Tucker v. Whitehead,* 59 Miss. 594; *Whitehead v. Kirk,* 104 Miss. 776. The manner of the destruction of the will does not have to be shown: 1 Alexander on Wills, p. 747, sec. 550 and cases; 3 Alexander on Wills, 2012.

The presumption of the destruction of the will *animo revocandi* may be overcome by proof, but there is no proof in this record anywhere that even tends to show that Watkins, the testator, did not destroy this will and we have the right to argue and assume under the authorities that he destroyed it immediately after he showed it to Hill when his conversation with Hill shows, if Hill is to be believed at all, that he understood the nature of his act, well recognized the nature of the property he owned and the pretended objects of his bounty and that his capacity measured up to the rule laid down in *Moore v. Parks,* 122 Miss. 334. If there was ever a lucid moment from that time on, in which he might have destroyed the will *animo revocandi,* it must be presumed that he did it at that time. 3 Alexander on Wills, p. 2012; *Scott v. Maddox,* 84 Am. St. Rep. 263.

V. *The capacity to execute or revoke a will.* The rule is universally established that either to execute or revoke a will a testator need not be in the full possession of his faculties to make or revoke a valid will, but he need only remember the natural objects of his bounty and the nature and condition of his property; and, as we have said, at the very time he showed the alleged will to Hill, Hill himself proves Mr. Watkins' capacity to do this very thing. The testator may be infirm in body and of weak mind and still be fully able to execute a will or to revoke one after it has been executed. *Moore v. Parks,* 122 Miss. 334; *Comstock v. Hadlyne Ecclesiastical Society,* 20 Am. Dec. 100 and note; *St. Leger's Appeal,* 91 Am. Dec. 735; 1 Alexander on Wills, secs. 328, 329, 330 and 331; *Brock v. Luckett,* 4 Howard 483 (Miss.); *Lambler v. Tryon,* 7 Ser. & Rowle, 95; *Hathorn*

v. *King,* 7 Am. Dec. 106; *Kerr* v. *Lunceford,* 2 L. R. A. 668, especially note on p. 676.

At this period in the history of the testator Watkins, let's refer to the proof on the question of capacity as gathered from the witnesses. The court must conclude that the overwhelming weight of testimony is in behalf of the contestant and it shows conclusively that Mr. Watkins was not only capable of executing a will but of revoking one at the time it was last alleged to have been seen by J. H. Hill and for a long time thereafter.

Now, just a few words as touching the expert testimony of Drs. Acker and Buchanan. It will be observed that both of these witnesses testified on hypothetical questions. The authorities generally hold that the opinions of experts based on hypothetical questions, witnesses who have prejudged the case in favor of those who introduce them, certainly to some degree, can never be held conclusive and controlling as against those persons, intelligent but not expert, who saw the testator daily or frequently, had transactions with him of a social and business character, and apply the common sense and the common observations of mankind. We submit that our own court has practically taken this position speaking through Judge SHARKEY, in the case of *Brock* v. *Luckett,* 4 Howard 483, but the matter is at length discussed in the recent case of *Austin* v. *Austin,* Ann. Case 1914D 336 and note.

Another rule of law confronts the proponents in this case, which is as follows: The whole contents of a lost or destroyed will before it is admitted to probate must be established by the clearest, most conclusive and most satisfactory proof, and it is the inclination of the courts everywhere in this country to apply with the greatest strictness to the cases of wills the rules applicable to the proof of the contents of lost instruments. As the basis of judicial action we have seen that such proof in the cases of lost wills must be clear, conclusive and sat-

isfactory—some courts use the word "convincing." 28
R. C. L. 380 381, 383; *Vining* v. *Hall,* 40 Miss. 83.

*In conclusion.* Mr. Justice LAMM of the supreme court
of Missouri in *Toomer* v. *Anderson,* 130 S. W. 185, con-
demns the growing tendency of courts and juries to set
aside last wills and testaments and to substitute in lieu
thereof their own notions as to what a testator should do
with his own property, saying: "A testator in writing
his will need not write it as a supplication to the jury;
viz. 'I wish my property to go to so-and-so, and hope
that a jury will think as I do and confirm my act.'"
See also our own court in *King* v. *Rowan,* 34 So. 327, quot-
ing with approval *McDevitt's case,* 30 Pac. (Cal.) 101.

We think we have shown that the miscarriage of jus-
tice was caused, as we have stated, by the court in making
up the issues, in the instructions to the jury, in the er-
ror in admission of testimony, and in a great many mat-
ters; but even if the court had committed no errors in
this case, we submit that the case is so overwhelmingly
in favor of the appellants that the verdict should be set
aside because manifestly and clearly wrong.  ·

*D. W. Houston, Sr.,* and *Jr., Paine & Paine* and *Young
& Coleman,* for appellees.

I.   *As to the due and legal execution of said will and
its contents and why testator made it.*   The due and legal
execution in June, 1918, of said last holographic will
propounded for probate and its contents and the reá-
sons why testator made said will, are all abundantly,
*undisputed and uncontradictedly* proved, not only by
W. B. Watkins, who drafted the will for the testator
to copy and sign in his own handwriting, but by four
other reputable, disinterested parties, who afterwards
saw and *read* its contents, besides other witnesses to
whom testator made declarations as to same; and all
of these witnesses stand absolutely *unimpeached* as well
as *uncontradicted.*

II. *The contents of this will were overwhelmingly
and uncontradictedly proved. Wilbourn* v. *Shell,* 59
Miss. 207-208, held that the contents of a holographic
will could be proved by a *single* witness, who was also
allowed to testify that the testator declared to said wit-
ness that it was his will and said that where there was
only the testimony of this solitary witness, "it would, in
most cases, be impossible to prove the contents of a lost
instrument if the evidence of one witness as in this case
should be held insufficient." *A fortiori,* is this applica-
ble to, and true, in the instant case, where so many wit-
nesses testified to the contents of the Watkins will.

III. *Declarations of testator are admissible to show
that he had made a will, or his testamentary intention
and desires, and what he had done to make them effective,
and to rebut the presumption of revocation. Tucker* v.
*Whitehead,* 59 Miss. 594; *Sheehan* v. *Kearney,* 82 Miss.
696; *Moore et al.* v. *Parks et al.,* 122 Miss. 340. Of course,
in the instant case we have the testimony of the drafts-
men as well as the four other witnesses who *actually read
the will and proved fully its contents.*

IV. *On the issue of undue influence of W. B. Wat-
kins, the draftsmen, as well as Lee and others competent
to testify as to the disposition which testator said he
wanted to make of his property and that the will was
made as he directed. Sanders* v. *Sanders,* 126 Miss.
622-3; *Spivy* v. *Walton,* 107 Miss. 56; *Sapphole* v. *Horn,*
72 Miss. 470; *Helm* v. *Sheeks,* 116 Miss. 730; *Hopper* v.
*Lacy,* 62 Miss. 572; *Cole* v. *Gardner,* 67 Miss. 670.

V. *Motion and charge of the court that there was no
undue influence in making will.* There is conclusive evi-
dence that there was not any undue influence. "In or-
der for the question of undue influence even to be sub-
mitted to the jury, there must be some testimony upon
which the jury could find that the will of the testator

did not speak the real mind or intention, but that of the person who dominated and influenced her." *Estes* v. *McGhee,* 97 So. 530.   See, also, *Sanders* v. *Sanders,* 126 Miss. 627; *Ward* v. *Ward,* 124 Miss. 698.

To show what is necessary to constitute undue influence and the degree of proof that is necessary to show the will is the free act of a competent mind, see *Gillis* v. *Smith,* 114 Miss. 665; *Gathings* v. *Howard,* 122 Miss. 356-7; *Burnett* v. *Smith,* 93 Miss. 566; *Moor* v. *Park,* 122 Miss. 331; *Maxwell* v. *Lake,* 127 Miss. 107.

VI.   *As to the competency of Dr. Coleman.*   With due respect to counsel, we are surprised that they should insist upon the doctor's competency in view of the many decisions of this court against this.   In all of the cases cited by counsel, except perhaps *Olson* v. *Court of Honor,* 100 Minn. 117, 8 L. R. A. (N. S.) 521, cited on the question of the waiver of the privilege by patient, the patient himself (not the proponents of a will) voluntarily opened the door of the consultation room by testifying and describing his ailments and what the physician had said to him and the treatment given him and by first introducing a physician himself to all of his ailments and treatment.   This is not all the state of facts in the instant case, and even if it were, this court has decided time and again that even this is not a waiver under our statute and that a majority of other states have so held, although these very authorities (being from New York and Missouri) now cited by counsel, were cited and considered by this court.

Besides the defendant here is not (as parties were in *Olson* v. *Court of Honor, supra*) the sole and only one who represents the deceased.   On the contrary, not only were the nieces and nephews, the devisees and beneficiaries in the will, representatives of the deceased, but also W. B. Watkins as the executor of the will, who is the representative of the deceased, and made so in his lifetime by his solemn will; and neither he nor any of the nieces

and nephews waived the privilege; but objected to its being waived.

In *McCaw* v. *Turner,* 126 Miss. 260, the very contention made here was made there, including the contention that the wife of the deceased is more interested and zealous in protecting his good name and character from discredit than anyone else. The case is re-affirmed in *Hunter* v. *Hunter,* 127 Miss. 683. See also *Railroad* v. *Messina,* 109 Miss. 145; *Newton Oil Mill* v. *Spencer,* 116 Miss. 568; *Railroad* v. *Robinson,* 106 Miss. 896, 64 So. 638.

VII. *Dr. Acker's testimony as an expert was competent.* The testimony of Dr. Acker is perfectly competent and stands on an entirely different ground from that of Dr. Coleman. He testified solely and only as an expert—which he was fully proved to be, and no objection was made to same on that ground—and not at all either as a physician or as a layman from his social contact with testator.

VIII. *As to incapacity to execute or revoke a will.* The law requires the same mental capacity to revoke a will as it does to make a will and if the testator does not possess the requisite mental capacity, an attempted revocation by him is of no effect. In this court counsel reverse the contention they made in the court below as to the proper questions to be asked the witnesses and the proper tests. Appellants are precluded and concluded from now shifting ground; and after getting the court below to adopt a test which counsel said was proper and right, they now attempt to get this court to say that it was wrong and that appellants were so much prejudiced by it that this court will absolutely reverse this case.

Contestant got the benefit of all points that they contended for, including the value and weight to be given to the opinion of experts and non-expert witnesses. In fact, they got the evidence and their charges more than they were entitled to, and are certainly in no position to complain, much less to obtain a reversal of this case on said grounds.

IX.  *As to the form of the issues submitted to the jury by the court.*  The only objection to the issues is as to the form thereof.  It would be a sufficient answer to quote the language from the following authorities cited by counsel, 11 Eng. Pl. and Pr., note 3, p. 668 and p. 720, and notes, which use the following language:  "Objection to the form of issues cannot be made for the first time on a motion for a new trial or on an appeal."  This is undoubtedly the law.  *Payne* v. *Banks,* 32 Miss. 292, cited as favorable to them, is, as a matter of fact, unfavorable to them and sustains the issues here made in this case.

X.  *As to peremptory charges given the proponents by the court.*  Really the only objection urged to these charges is the propriety of the language used and the statement that by this language and its implications they foreclose the whole case and leave the jury nothing to decide.  On the contrary, issue four submitted to the jury the question as to whether the paper, Exhibit "A," was afterwards revoked by the testator when he was mentally incapacitated to revoke the same and contestants were granted a dozen or more most favorable charges on this very issue and the jury passed upon all of this question as to the revocation and decided that said Exhibit "A" was not revoked at any time while the testator was mentally capacitated to revoke it, and that it was seen intact, uncanceled and unrevoked long after the testator was proved to have been of such unsound mind as to have been incapable of revoking it; and on the fifth issue contestant was granted a peremptory charge as to the destruction.

XI.  *Presumption of revocation may be rebutted and the fact of the loss or destruction may be proved by circumstantial evidence.  Wells* v. *Wells,* 35 Miss. 663; *Schutz* v. *Schutz,* 35 N. Y. 653-6, 91 Am. Dec. 88; 1 Schouler on Wills, Exrs., etc. (5th Ed.), sec. 402; *Graham* v. *Burch,* 28 Am. St. Rep. 348; 1 Schouler on Wills, Exrs.

and Admrs. (5th Ed.), sec. 402, pp. 501-2; 3 Alexander on Wills, p. 2013. Therefore, as stated, none of the authorities cited by counsel applies here, including *Scott* v. *Maddox*, 84 Am. St. Rep. 263, because as stated by the court in that case, the evidence there was not sufficient to overcome the presumption which arises in such a case; and the reason given by the court in that case was because it was not shown "that the testator lapsed into a state of unconsciousness immediately after the declaration to Bonner that he desired his will to be carried out."

*Conclusion.* Our proof was clear, conclusive, satisfactory and convincing, and the jury on a controverted question of fact so decided, so that certainly counsel cannot complain of any prejudicial error such as to reverse the case.

Argued orally by *A. J. McIntyre* and *Geo. J. Leftwich,* for appellants, and *D. W. Houston, Sr.,* and *Thomas Fite Paine,* for appellees.

COOK, J., delivered the opinion of the court.

This is an appeal by Mrs. Josephine Clark Watkins as an individual, and as administratrix of the estate of W. L. Watkins, deceased, from a decree of the chancery court of Monroe county, Miss., based on a jury verdict in favor of W. B. Watkins, executor of the alleged last will and testament of W. L. Watkins, deceased, and all the children of W. B. and G. H. Watkins, Mrs. John Gibson, and Mrs. Wiley P. Harris, brother and sisters, respectively, of W. L. Watkins, who were complainants in the court below and proponents of the alleged last holographic will and testament of the said W. L. Watkins; said decree establishing and ordering said last will and testament to be admitted to probate as the true and genuine last holographic will and testament of W. L. Watkins, deceased.

The bill of complaint as amended, after setting forth the names and residence of all parties complainant and defendant, averred, among other things: That "in or

about the month of June, 1918, the said Wade Leroy
Watkins duly and legally executed in writing his holo-
graphic last will and testament; it being wholly written
and subscribed by him according to the statute in such
cases made and provided.'' That by said last will and
testament said Wade Leroy Watkins bequeathed and de-
vised his estate as follows, to-wit: First, to his wife,
Mrs. Josephine C. Watkins, his residence and household
effects on West Commerce street in Aberdeen, Miss., and
the sum of one hundred thousand dollars; second, to his
namesake, Edith Leroy Watkins, his farm across Tom-
bigbee river in Monroe county, Miss.; third, to the chil-
dren of his only two brothers, W. B. Watkins and G. H.
Watkins, and his only two sisters, Mrs. Susan Gibson
and Mrs. Grace W. Harris, testator's nephews and nieces
(naming them), and any nephews and nieces that might
be thereafter born, all the rest and remainder of his es-
tate, real or personal, including his prairie plantation
near Muldon, Miss., known as the ''Troup Place.'' That
by his said last will and testament his brother W. B. Wat-
kins, and his wife's father, W. H. Clarke, were appointed
as executors of said will, and that a true or substantial
copy of such will was annexed to the bill as an exhibit
thereto.

The bill further averred that the said Wade Leroy
Watkins, at the time of making and executing his said
last will and testament, was of sound and disposing mind
and memory and was not acting under duress or re-
straint; that, some time after the execution of said last
will and testament by the said Wade Leroy Watkins,
he became mentally incapacitated to revoke, annul, or
cancel said last will and testament, and did not, before
becoming mentally incapacitated so to do, or before his
death, revoke, cancel, or annul said will; and that the said
last will and testament was a valid instrument as and
for his last will and testament of his real and personal
property at the time of his death.

The bill further averred that, since the death of the said W. L. Watkins, the said W. B. Watkins and G. H. Watkins, to the end that said instrument might be presented for probate, had made and caused to be made diligent search and inquiry therefor, and had not and could not ascertain the whereabouts thereof, and, upon information and belief, charged that said instrument had been lost or destroyed, without the knowledge, consent, or procurement of said testator, W. L. Watkins, deceased. Other averments of the bill are not material to decision of the cause. The bill prayed that all proper issues be made up to determine whether the instrument attached to the bill as an exhibit was a true or substantially correct copy of the last will and testament of the deceased, and should be admitted to probate as such last will and testament.

The answer denied all the material averments of the bill of complaint, and averred upon information and belief that, if the said W. L. Watkins ever at any time executed a paper purporting to be a last will and testament, such instrument was procured by the undue influence of the complainants, or some of them, or some other person acting for them, and that such document, if any ever existed, was not and is not the last will and testament of the said W. L. Watkins. The answer admitted that in June, 1918, W. L. Watkins was of sound and disposing mind, but denied that he was not acting under duress or restraint if he ever signed the alleged will. It repeatedly denied that any such will was executed by W. L. Watkins, or that any document or instrument executed in his lifetime as his last will and testament had been lost or destroyed without the knowledge, consent, or procurement of the said W. L. Watkins, deceased, but averred that, if any such document or instrument ever existed he, the said W. L. Watkins, in his lifetime and long before his death, had, for good and sufficient reasons, become dissatisfied with the same and the disposition thus made

of his property, and that he voluntarily revoked the same, either by destruction or otherwise.

The answer further denied that the said W. L. Watkins ever at any time became mentally incapacitated to revoke, annul, or cancel said alleged last will and testament, denied that he did not, before becoming mentally incapacitated to revoke, annul, or cancel said alleged last will and testament, or before his death, revoke, cancel, or annul the same, and denied that said alleged will was at the time of his death a valid instrument as and for his last will and testament.

Before the trial in the court below the contestant, Mrs. Josephine Watkins, filed a motion to require the complainants to make more definite and certain the averment of the bill that "said will had been lost or destroyed, without the knowledge, consent, or procurement of said testator," by giving the time, place and circumstances referred to and relied upon, and also to make more definite the averments that "the testator became mentally incapacitated to revoke, annul, or cancel a will," by stating the time when it was claimed that the testator became so incapacitated. This petition was overruled as to the first ground, but sustained as to the second, and an order was entered requiring complainants to amend their bill so as to state when, or about the time when, the testator was claimed to have become mentally incapacitated to revoke, annul, and cancel his alleged last will and testament. To this order of the court, the complainants reserved an exception, and thereupon responded to the order by filing an amendment averring that this mental incapacity was first noticed in the year 1921, but that, on account of the nature and character of the particular mental unsoundness with which the testator was affected, it was impracticable to be more definite.

The proponents having filed a motion that an issue *devisavit vel non* be made up, and a jury summoned to try the issues, an order was entered propounding the following issues:

"First. Did Wade Leroy Watkins make, publish, and declare his last holographic will and testament in or about the month of June, 1918?

"Second. If Wade Leroy Watkins did make, publish, and declare his last holographic will and testament in or about the month of June, 1918, is Exhibit A to the original bill in this cause a true or substantially correct copy of said last holographic will?

"Third. If Wade Leroy Watkins did make, publish, and declare his last holographic will in or about the month of June, 1918, and if Exhibit A to the original bill in this cause is a true or substantially correct copy thereof, was the said holographic will executed as a result of undue influence?

"Fourth. If Wade Leroy Watkins did make, publish, and declare his last holographic will and testament in or about the month of June, 1918, and if Exhibit A to the original bill is a true or substantially correct copy thereof, was this will afterwards revoked by him at a time when he was mentally capacitated to revoke the same?

"Fifth. If Wade Leroy Watkins did make, publish, and declare his last holographic will and testament in or about the month of June, 1918, and if Exhibit A to the original bill in this cause is a true or substantially correct copy thereof, was this will lost or destroyed without the knowledge, consent, or procurement of the said Leroy Watkins?"

The first and second assignments of error assail the form of the issues submitted to the jury; the contentions being that the issues as propounded involve legal conclusions, assume as true facts which were to be established by the complainants, and that by the use of the words "holographic," and "last will and testament," the language of these issues was technical and calculated to confuse the issues and mislead the jury.

We do not think the issues propounded are subject to the criticism directed against them by counsel. It is true

that the issues must be made up from the pleadings and must submit issues of fact and not issues or conclusions of law, but the issues submitted seem to us to meet this requirement. The first issue, "Did Wade Leroy Watkins make, publish, and declare his last holographic will and testament in or about the month of June, 1918," presents a pure question of fact to be determined by the jury from the testimony, while the second issue is, if the jury finds as a fact that he did make, publish, and declare such a will, then the issue of fact is submitted to the jury to find whether the exhibit to the original bill is a true or substantially correct copy of such will. If the jury have found that such a will was made, published, and declared, and that the exhibit is a true or substantially correct copy thereof, then, under the third issue, it is required to find as a fact whether such will was executed as a result of undue influence. If under the first and second issues, the jury found in favor of the alleged will, then, under the fourth, it was required to find whether the will was afterwards revoked by the testator at a time when he was mentally capacitated to revoke the same, and, under the fifth, whether the will was lost or destroyed without the knowledge, consent, or procurement of the testator. These issues presented for the determination of the jury all the material controverted facts presented by proponent's bill and the denials and averments of the contestant's answer, and when these issues are all considered together, in the light of the instructions to the jury, there is nothing in the language thereof which was calculated to confuse or mislead the jury to the prejudice of contestant. If it be conceded that the word "holographic" standing alone is technical and would probably not be understood by the jury, this criticism is unavailing, in view of the third instruction granted to the proponents, which in plain language informed the jury that, under the laws of this state, a holographic will is a will wholly written and subscribed by the person writing the will. The words "last will and testa-

ment'' are so well understood and of such common usage that they could hardly mislead a jury of ordinary intelligence, and when the first and second issues are considered together, as they must be, they are not subject to the criticism that they do not restrict the findings of the jury to the alleged will which the pleadings attempt to establish, but the second issue specifically submits to the jury the question as to whether or not he did make, publish, and declare the paper exhibited with the bill as his last will and testament. We do not think the form of the issues propounded presents any reversible error.

Upon the first and third issues, the court granted the proponents peremptory charges to the effect that Wade Leroy Watkins did make, publish, and declare his last holographic will in or about the month of June, 1918, and the same was made, published, and declared without and not as a result of undue influence, and appellant complains of these two instructions. We do not understand that appellant seriously contends that it was error to grant peremptory instructions upon these issues, but the argument of counsel is directed principally to the form of the instructions.

To establish the due and legal execution of the alleged will, the proponents offered five witnesses, but we shall not undertake to state the substance of all their lengthy testimony. W. B. Watkins, a brother of W. L. Watkins, testified that in June, 1918, W. L. Watkins informed him that he desired to make a will and how he desired his property to go, and requested him to draft a will for him in accordance with his desire and purpose; that he prepared a rough draft of the will, in accordance with the directions given him by his brother, and delivered this copy to his brother to be executed in holographic form; that a few days thereafter W. L. Watkins informed him that the form of the will was satisfactory; and that he had written it out, signed it up, and put it away. This witness gave the contents of the will which he drafted

and turned over to his brother, which was substantially the same as the exhibit attached to complainant's bill.

Jeff Lee, who was a partner of W. L. Watkins in the grocery business from January, 1916, to January 1, 1921, testified that about June 1, 1918, the testator discussed with him his plan to make a will, and the disposition he expected to make of his property, and that about two weeks thereafter the testator came to his desk in the store and stated to him that he had made his will; that he thereupon handed to the witness a will and asked him to read it, and he did read it; that he was perfectly familiar with the handwriting of the testator, and the will and signature was wholly in his handwriting; that it was written with an indelible pencil on two pages of unlined typewriter paper, filling one page and probably two-thirds of the other; that testator asked him to put it in a private drawer of their iron safe, where their private papers were kept; that he read the will twice thereafter when he came across it in going through some private papers in this drawer; and that the will was in the same drawer when he sold his interest in the business January 1, 1921. This witness testified that he did not tell any one about the will, except his wife, to whom he told its contents the same night that he first read it, and, when asked to tell the contents of the will, he gave them practically and substantially the same as the exhibit to the bill of complaint.

Mrs. Jeff Lee testified that she was familiar with the handwriting of the testator; that while he and her husband were partners from January, 1916, to January, 1921, she worked in the store frequently; that one night in June or July, 1918, when she and her husband were at the store working on the books, in getting some papers out of the private drawer of the safe, her husband came across this will and handed it to her to read; that it was wholly in the testator's handwriting, and signed "Wade Leroy Watkins;" that it was written with an indelible lead pencil, on two pages of plain white typewriter paper, letter size, and she gave the contents of the will

substantially as they appear in the copy filed as an exhibit to the bill.

W. B. McCluney, a brother-in-law of W. B. Watkins, and cashier of the Bank of Aberdeen, during the year 1921 and prior thereto, testified that he was familiar with testator's handwriting; that the testator frequently forgot and left papers out of his box in the bank vault, and on August, 1921, he found a wallet on his desk at the bank, and, desiring to ascertain whose it was, he opened and found therein the will of W. L. Watkins, which he read; that he then telephoned to Mr. Watkins and he came down and put the will back in a tin box, which he kept locked in the vault of the bank; that the will was written with pencil on two sheets of plain white paper, letter size and unruled, and was wholly in the handwriting of the testator, and signed "Wade Leroy Watkins;" and that it bore a date in the year 1918, and, according to his best recollection, June, 1918. This witness gave the contents of the will substantially as they appear in the copy filed as an exhibit to the bill of complaint.

J. H. Hill testified that he was employed by the testator at frequent intervals from 1913 to 1922; that in 1919, and on a later occasion, the testator told him that he had made a will by which he had provided that his wife would receive one hundred thousand dollars and his house, and that the balance of his property would go back to his people; that in July, 1922, on the streets of Aberdeen, just after one of the testator's nieces had affectionately greeted him, he told the witness that he had provided liberally for this little girl and would show him that he had done so; that he thereupon took from his pocket and showed to him a written instrument, which was headed "Last Will and Testament of W. L. Watkins;" that the entire instrument was in the testator's handwriting, and was written on two sheets of unruled paper, letter size, and was signed Wade Leroy Watkins, bore date of June, 1918, and contained a provision for testa-

tor's wife of one hundred thousand dollars and the house and contents located on Commerce street.

The testimony of these several witnesses as to the due and legal execution of the will about June, 1918, is clear and explicit, and is not controverted by any fact or circumstance in evidence. There was no testimony whatever tending to establish the issue of undue influence, and, consequently, the proponents were entitled to peremptory instructions upon these, the first and third, issues.

What has herein been said in reference to the form of the issues propounded applies to the criticism of counsel of the form of these two instructions. Although couched in language similar to that in which the issues were propounded, these charges do not purport to cover the entire scope of the controversy and leave nothing for the jury to decide, as contended by counsel. They are limited to the issues as to whether Mr. Watkins did, in the month of June, 1918, make, publish, and declare his last holographic will and testament, and, if so, whether it was executed as a result of undue influence, and there were left for decision by the jury issues as to whether the alleged copy of the will, which was filed as an exhibit to the bill, was a true or substantially correct copy of such will, and, if so, whether this will was revoked by the testator at a time when he was mentally capacitated to revoke the same, the real issue around which the trial in the court below revolved. The contention of counsel that the use in these charges of the word "last" in connection with the words "will and testament" tended to foreclose the other issues and to mislead the jury is hypercritical, and, in view of the many charges granted which covered every phase of the law applicable to the other issues, is without merit.

The court below granted the contestant a peremptory charge on the issue as to whether the will was lost or destroyed without the knowledge, consent, or procurement of the testator, but refused a general peremptory charge requested by her, and, upon the action of the

court in refusing this charge, the principal reliance for a reversal is based.

The court correctly held it to be established by the evidence that Mr. Watkins did, about June, 1918, duly execute a will, and there was abundant testimony from which the jury might find that the alleged copy of this will, filed as an exhibit to the bill of complaint, was a true or substantially correct copy of such will. There then remains for consideration the question as to whether the issue of revocation of the will at a time when the testator was mentally capacitated to revoke the same was properly submitted to the jury.

The evidence discloses that a very diligent search for this will was made, and that it could not be found, and, where a will is traced to the possession of the testator and cannot be found after his death, the presumption arises that he destroyed it *animo revocandi,* but this presumption may be overcome by proof that the will was in existence at a time when the testator was mentally incapacitated to revoke the same and that he never thereafter became mentally capacitated to revoke it. 3 Alexander on Wills, p. 2012; *Tucker* v. *Whitehead,* 59 Miss. 594. The degree of mentality required to revoke a will is the same as that required to make one, and it has been held by this court that one who understands and appreciates the nature of his act, the natural objects or persons of his bounty and their relations to him, and is capable of reasoning and thinking of how he desires to devise and bequeath, or dispose of, his property, possesses the necessary testamentary capacity, *Moore* v. *Parks,* 122 Miss. 301, 84 So. 230, and in the case at bar the burden of proof rested upon the proponents to show that the testator, at no time after the will was last shown to have been in existence, ever possessed mental capacity to make or revoke a will.

The evidence on this issue, comprising as it does many hundreds of pages, is entirely too lengthy to undertake, within the limits of this opinion, to set out even the substance thereof, and, since each case must rest up-

on its own facts, to undertake to do so would serve no useful purpose. The proponents offered one witness, J. H. Hill, whose testimony would warrant a finding by the jury that the 1918 will was in existence and in the possession of the testator in July, 1922. Counsel for the appellants very earnestly contends that the testimony of this witness does not support the conclusion that the will shown to this witness in July, 1922, was the same will that was executed by the testator in 1918, and they base this contention largely upon the fact that the witness in one place referred to the will shown to him as being on two typewritten pages of paper, at least it is so transcribed in the record before us. We have already referred to and set out certain portions of the testimony of this witness, and when his entire testimony is considered together, it seems manifest that the construction placed upon it by counsel is not warranted, and that the witness did not intend to testify that the will shown to him by the testator was a typewritten document. When asked the direct question, he testified that he was familiar with the testator's handwriting, and that all of the will was written by Mr. Watkins and signed by him; the signature being "Wade Leroy Watkins." He further testified that the will was dated in June, 1918, was written on two sheets of unruled, letter size paper, and on cross-examination he testified as follows:

"You saw his signature at the bottom? A. Yes, sir.

"Q. How was it signed? A. Wade Leroy Watkins.

"Q. How was it written? A. Written with an indelible pencil.

"Q. Wasn't written with a lead pencil? A. What I call indelible pencil.

"Q. What was the color of it? A. Blue pencil; dark blue."

Other parts of the testimony of this witness clearly indicate that he did not say, or intend to say, that the will was a typewritten document, and when all his testimony is considered together we think it sufficient to warrant the

jury in finding that the will shown to the witness by the testator was the will executed in 1918.

Upon the issue as to the mental capacity of the testator to revoke this will, the proponents offered a large number of witnesses, including intimate friends and former business associates of the testator, his brothers and sisters and two experts. The lay witnesses testified as to their association with the testator during the several years preceding his death, and gave in detail symptoms, facts, circumstances, and incidents from which they reached the conclusion that the testator's mind became unsound, and from these facts and circumstances testified that in their opinion, from the summer and fall of 1921, the testator was mentally incapacitated to revoke a will.

Upon hypothetical questions based upon the symptoms, facts, circumstances testified to by the lay witnesses, the two expert witnesses testified that in their opinion the testator was suffering from a form of insanity known as general *paresis;* that this is a form of insanity caused by the deterioration or destruction of the nerve cells of the brain; and that it is a progressive disease which gradually grows worse after it first develops, and after the disease first develops the person affected is thereafter totally incapacitated to revoke a will or intelligently transact ordinary business; and, after a very careful and repeated examination of all the testimony, we have reached the conclusion that the court below was correct in refusing the general peremptory instruction requested by the contestant, and in submitting the issue to the jury.

As opposed to this testimony for the proponents, the contestant offered many responsible witnesses, who had been intimately associated with the testator in a social and business way, who testified that they did not observe in the testator any of the peculiarities or symptoms testified to by the proponent's witnesses until the summer of 1923, and that prior to that time he was, in their opinion, of perfectly sound mind. The conflicts in

the testimony, however, were for the jury to pass upon, and, although we may not be entirely satisfied with their findings, we cannot invade their province by setting a-side this verdict which has been approved by the chancellor.

Dr. J. W. Coleman was offered by contestant as a witness to testify as to his knowledge of the mental condition of the testator, including such knowledge as he acquired while treating the testator as his patient from 1918 up to the time of his death; such testimony being offered on the theory that the contestant, as the sole heir at law of the deceased, and as the administratrix and personal representative of the deceased and the estate, could waive the privilege extended under section 3695, Code of 1906 (section 6380, Hemingway's Code), which provides that:

"All communications made to a physician or surgeon by a patient under his charge or by one seeking professional advice, are hereby declared to be privileged, and such physician or surgeon shall not be required to disclose the same in any legal proceeding, except at the instance of the patient."

The court below refused to permit this testimony to be introduced, and the appellant assigns as error the refusal so to do, and in support of this assignment cites numerous cases from other courts, practically all of which have been cited in prior cases before this court, but we think this question has been settled adversely to appellant's contention by prior decision of this court. *Railroad Co.* v. *Messina,* 109 Miss. 143, 67 So. 963; *Illinois Cent. R. Co.* v. *Messina,* 111 Miss. 884, 72 So. 779; *Hamel* v. *Railroad Co.,* 113 Miss. 345, 74 So. 276; *Newton Oil Mill* v. *Spencer,* 116 Miss. 568, 77 So. 605; *United States F. & G. Co.* v. *Hood,* 124 Miss. 548, 87 So. 115, 15 A. L. R. 605; *McCaw et al* v. *Turner et al.,* 126 Miss. 260, 88 So. 705; *Hunter* v. *Hunter et al.,* 127 Miss. 683, 90 So. 440.

In the *Hood case, supra,* the court, after discussing various reasons that might have prompted the enact-

ment of this statute, concludes with the observation that—

"Whatever may have been the reason for the enactment of the statute, the statute expressly prohibits a physician from testifying without the consent of the patient."

In the *McCaw-Turner case, supra,* the court said:

"The statute in plain and unambiguous language limits the right to waive the privilege to the physician's patient, and the right must be so limited by the courts, unless the manifest reason and obvious purpose of the statute would be sacrificed by adhering to a literal interpretation of its language [citing authorities].

"The manifest reason and obvious purpose of the statute is to enable a patient to disclose his infirmities to his physician in order that the physician may prescribe for his disease without fear that his feelings will be shocked or his reputation tarnished by their disclosure by the physician without his consent, which purpose will not only not be sacrificed by giving the words of the statute their usual and ordinary meaning, but, on the contrary, will be sacrificed, unless its words are given that meaning.　The statute does not limit the privilege to the life of the patient, neither does it confer upon his heirs or devisees who may quarrel over his property the right to tarnish his reputation by causing his physician to disclose his infirmities."

On the theory that the testimony of this witness would not have tended to tarnish the reputation or discredit the testator, but, on the contrary, would have been to his credit, the appellant seeks to bring this testimony within the reservation or supposed qualification found in the language of the court in the McCaw case to the effect that the right to waive the privilege must be limited to the patient, unless the manifest reason and obvious purpose of the statute would be sacrificed by adhering to a literal interpretation of its language.　In view of the later decisions of the court, it is doubtful whether any such qualification is now recognized, but, whatever

may have been in mind of the court as justifying a departure from a literal interpretation of the language of the statute, it was not the circumstance that the proffered testimony does not tend to discredit the deceased. If this is made the basis for a qualification of the language of the statute, to determine the admissibility of the proposed testimony would usually involve a judicial inquiry into the nature and character thereof, and in the *Hood case, supra,* it was expressly held:

That the ''evidence of a physician ought not to be received before the court, and it is error for the court to proceed upon the idea that the judge and the public may hear the statement of the physician in such case, though it be excluded from the jury.''

In the *Hunter case, supra,* it was expressly held that a privileged communication of a patient to his physician could not be disclosed, except at the instance of the patient; the court there using the following language:

''The court erred in admitting the testimony of Dr. Rush; it was a privileged communication of the patient under his charge, which could not be disclosed, except at the instance of the patient.  Section 3695, Code of 1906 (section 6380, Hemingway's Code); *Yazoo & M. V. R. Co.* v. *Messina,* 109 Miss. 143, 67 So. 963; and *McCaw* v. *Turner* [126 Miss. 260], 88 So. 705.

''We think the *McCaw case, supra,* has entirely and finally settled the question as to the admissibility of testimony which discloses privileged communications between physician and patient; that is, so far as the privileged communication statute, supra, is concerned.''

From these authorities, it is clear that no error was committed in excluding this testimony.

After this witness had testified that he could segregate in his mind the knowledge which he acquired about the condition of the testator from having been his physician from that acquired from social contact with him, he was permitted to testify to what he had learned about the testator from this social contact, and to give his opinion, based thereon, that he was of sound mind.

The appellant also complains of the admission of the testimony of Dr. J. M. Acker, who was, at a time when the testator's mind was admittedly perfectly sound, the physician of testator, on the ground that his testimony was privileged under the statute. The witness did not testify either as a physician or from knowledge acquired from social contact with the testator, but after having testified that he could segregate in his mind all knowledge he had obtained about the testator from having been his physician, and base his testimony solely on hypothetical questions to be propounded to him, he was permitted to testify solely, as an expert, in answer to hypothetical question based upon the testimony of the lay witnesses, and the admission of this testimony was not error.

There are numerous other assignments of error based upon the form of questions to witnesses, and upon the admission and exclusion of testimony, all of which have been carefully examined and considered, and we do not think any of them present reversible error. Other assignments of error complain of certain instructions granted to proponents, and, while there may be technical inaccuracies in some of these instructions, these errors were cured by instructions granted the contestant. The contestant secured twenty-four instructions, which were drawn with consummate skill, and covered fully and completely every phase of the law applicable to the issues submitted to the jury, and when all these instructions are considered together, as they must be, one as limiting, modifying or supplementing another, they fairly and accurately announce the law which should guide the jury in passing upon the issues.

In the case of *Cox* v. *Tucker,* 133 Miss. 378, 97 So. 721, it was held that a new trial on an issue *devisavit vel non* will not be granted on the ground that the verdict is against the overwhelming weight of the evidence, even though the court should be of the opinion that the evidence against such verdict is strong, while the evidence

in its favor has elements of weakness, where the latter is not unbelievable, and the court there said:

"In a case where the evidence is conflicting and the verdict depends upon the weight to be given the testimony of the witnesses, and upon inferences to be drawn from facts proven and the conduct of the parties in interest, a new trial will not be granted, except for clear and manifest error in the rulings of the court, or where the verdict is against the overwhelming weight of the evidence."

Again, in the case of *Ætna Insurance Co. et al.* v. *Robertson,* 131 Miss. 343, 94 So. 7, 95 So. 137, it was held:

That "on appeal to this court, on all questions of fact, the inquiry is not whether the chancellor's decision was right, or whether, on the facts, this court would have reached a different conclusion, but whether from all the facts, and the reasonable inferences to be drawn therefrom, the decree is manifestly wrong."

In this case, we are unable to say with confidence that the verdict of the jury is against the overwhelming weight of the evidence, or that the decree of the chancellor, based upon the jury verdict, is manifestly wrong, and consequently the decree of the court below will be affirmed.

*Affirmed.*