955 So.2d 943 (2007)
In the Matter of the ESTATE OF Russell HOOD, Deceased, Appellant.
Cheryl D. Horne, Petitioner,
v.
Bernie O. Parker and Wife, Marilyn S. Parker, Appellees.
No. 2005-CA-00964-COA.
Court of Appeals of Mississippi.
May 1, 2007.
*945 Al Shiyou, Hattiesburg, attorney for appellant.
R. Andrew Foxworth, Columbia, attorney for appellees.
Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Cheryl D. Horne, as administratrix of the estate of Russell Hood, brought this action to set aside a conveyance made from Hood to Bernie O. and Marilyn S. Parker. The chancellor denied the petition. Horne appeals and argues that: (1) the presumption of undue influence was not rebutted, (2) the chancellor should have considered Kelly v. Shoemake, and (3) a constructive trust must be placed on the subject property. We find no error and affirm.

FACTS
¶ 2. Hood owned a homestead, which consisted of two acres at 1771 Old Highway 35 North, Columbia, Mississippi. In a 1993 will, Hood devised his homestead and bequeathed all his personal property to Horne. She is his only child and a resident of Ohio.
¶ 3. Over time, Hood wanted to be sure that Horne would come to live in his home after his death. On February 1, 1997, he wrote Horne a letter asking her to decide whether she would move to Mississippi to live in the house after he died. He wrote, "I will hold up on changing my will u[n]til March 1[,] 1997. That will give you a month to let me know." Horne responded that she was not sure whether she would or not.
¶ 4. On March 4, 1997, Hood executed a new will which left all his property to the Parkers. The Parkers resided directly across the street from Hood. Finally, on September 9, 1998, Hood deeded his homestead to the Parkers, without a reservation of a life estate. Bernie Parker testified that this was based on his agreement with Hood that Bernie would carry out Hood's wishes with regard to the property. Namely, Bernie would let Hood remain in the house until he died, would pay the property taxes and insurance, would help maintain the property, would have Hood cremated after death, and would give Irene Few anything of his personal property that she wanted.
¶ 5. Irene Few was Hood's neighbor and girlfriend, as well as Bernie's mother. The Parkers were Hood's friends. Bernie was the minister of music at First Baptist Church in Columbia. He became concerned about Hood's salvation and would ask him to church. Hood never accepted the offer. The Parkers and Hood would help each other with their respective gardens. Hood was hard of hearing, so Bernie would accompany him to his many doctor visits and hospital stays. On occasion, the Parkers and Few would drive Hood where he wanted to go, because they were concerned about his old car. Hood was capable of driving himself and very *946 often did. Few had a joint savings account with Hood and helped him pay his bills.
¶ 6. Hood passed away on October 19, 1999. Bernie informed Horne of the deed and of the 1997 will. With Bernie's permission, Horne took her father's china and family pictures out of the house. Horne then began this action to set aside the deed. The chancellor found that although Horne raised a presumption of undue influence, the Parkers had successfully rebutted it. Aggrieved, Horne appeals.

STANDARD OF REVIEW
¶ 7. Undue influence is a question of fact. Watkins v. Watkins, 142 Miss. 210, 229, 106 So. 753, 755 (1926). A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss.2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8). "The determination of the existence of a constructive trust is a matter of law and thus, subject to de novo review." Allred v. Fairchild, 785 So.2d 1064, 1068(¶ 7) (Miss.2001).

ANALYSIS
I. Did the Parkers successfully rebut the presumption of undue influence?
II. Should the chancellor have considered Kelly v. Shoemake for the proposition that Hood was unduly influenced because he was not truly independent?
¶ 8. Because these issues both address whether the presumption of undue influence was rebutted, we consider them together. Horne argues that the Parkers failed to rebut the presumption of undue influence raised in this case. The Parkers assert that there is substantial credible evidence to support the chancellor's finding and that Few's actions are not imputed to them.
¶ 9. A party claiming an inter vivos transfer is void because of undue influence must show by clear and convincing evidence that a confidential relationship existed between the grantor and grantee/beneficiary. Estate of Hawkins, 737 So.2d 432, 434(¶ 9) (Miss.Ct.App.1999). When such a relationship exists, the presumption of undue influence arises automatically. Lancaster v. Boyd, 803 So.2d 1285, 1289(¶ 9) (Miss.Ct.App.2002); Hawkins, 737 So.2d at 434(¶ 9).
¶ 10. Once the presumption is established, the burden shifts to the fiduciary to rebut the presumption by clear and convincing evidence. Id. In order to overcome the presumption, the Parkers must show (1) that they exhibited good faith in the fiduciary relationship with Hood; (2) Hood acted with knowledge and deliberation when he executed the deed, and (3) Hood exhibited independent consent and action. Lancaster, 803 So.2d at 1289(¶ 10).
¶ 11. First, we consider whether there was substantial credible evidence that the Parkers acted in good faith. To determine this element, we must examine five factors: (1) who sought the preparation of the deed, (2) where and in whose presence was the deed executed, (3) what was the fee that was paid to execute the deed, (4) who paid the fee, and (5) was the deed executed openly or secretly. Rogers v. Pleasant, 729 So.2d 192, 194 (¶¶ 8-11) (Miss.1998).
¶ 12. The evidence was that Hood sought preparation of the deed. First, in the February 1997 letter Hood stated he would give the property to someone other *947 than Horne if she would not promise to live there. Secondly, Bernie testified that one year prior to the execution of the deed, Hood offered to give the Parkers the property, but Bernie insisted Hood give it to a family member. The Parkers both testified that the first they knew of the deed was when Hood delivered it to them. Drafting attorney Fred Cooper testified that Hood was the one who contacted him about the deed. It was executed in Cooper's office, with only Hood and Cooper present. There was no testimony as to the fee that was paid, but Cooper testified that Hood paid it. Hood did not tell anyone, including the Parkers, when he executed the deed. All parties knew, however, that Hood had already changed his will to devise the property to the Parkers. We find there was substantial credible evidence that the Parkers exhibited good faith in this transaction.
¶ 13. Next, we look at whether Hood acted with knowledge and deliberation when the deed was executed. We must consider four factors: (1) Hood's awareness of his asset and its general value, (2) an understanding by Hood of the persons who would be the natural inheritors of his bounty under the laws of intestacy or under a prior will and how the proposed change would legally affect the prior will or natural distribution, (3) whether non-relative beneficiaries would be excluded or included, and (4) knowledge of who controls Hood's finances and business and by what method, and if controlled by another, how dependent was Hood on her and how susceptible to her influence. Id. at 194(¶ 13).
¶ 14. The evidence was undisputed that Hood was aware that his homestead was an asset. He appeared aware of its general value. Particularly, he took great pride in the place as his own home and land that, according to the February 1997 letter, he "work[ed] all [his] life to get." The evidence is undisputed that Hood was aware that Horne was his only heir and beneficiary under his prior will. He was also fully cognizant that the deed would disinherit her. In fact, that was the ultimatum he gave her in the February 1997 letter. She had until March 1 to agree to live in the house after he was gone or else he would change his will to give the property to someone else. When she could not agree, true to his word, on March 4, 1997, Horne changed his will. Over a year later, he drafted the deed, which in effect accelerated the transfer to the Parkers. No one disputes that Hood knew that the Parkers were non-relative grantees and that he was favoring them over his family. Finally, there was testimony that Hood shared a joint account with Few and that she helped him pay his bills. There was no evidence that she controlled his finances or he was susceptible to her influence. He was a headstrong, independent man, purchasing and selling cars and trading other items on his own. We find there is substantial credible evidence to support the finding that Hood acted with knowledge and deliberation when the deed was executed.
¶ 15. The final element we must examine is whether Hood exhibited independent consent and action. The evidence was only that Hood was fiercely independent. Horne admitted he was stubborn, had a mind of his own, and was very private. Hood apparently saw himself this way as well. In the February 1997 letter to his daughter, he wrote:
Pumpkin, I didn't buy this place sold [sic] I bought it so that when my time[']s come, I would die in my home not an old peoples['] Home. Or up North. And I won[']t live with any one. Special my kin. I am not the kind to ask for Help from anyone[.] I have alway[s] taken *948 care of myself[,] for the past 45 years[,] and never asked anyone for help. Me, I help myself.
Hood made up his mind to give the property to the Parkers, and neither Bernie nor Horne could persuade him otherwise. Hood was concerned that rising medical costs would force him out of his home into a nursing home. Not receiving the assurances he sought from his daughter, he sought these assurances from the Parkers. Hood set out the conditions of the transfer: the life estate, the taxes and insurance, the maintenance, the cremation, and the disposition to Few. Hood took himself to the attorney to have the deed executed. Cooper counseled Hood to reserve a life estate in himself, but he declined. Instead, Hood secured a recognized life estate from the Parkers. We find there was substantial credible evidence for the chancellor to find that Hood acted with independent consent and action.
¶ 16. Nevertheless, Horne insists that Kelly v. Shoemake, 460 So.2d 811 (Miss. 1984), mandates that we reverse this case for the mere fact that Few had a joint savings account with Hood and helped him pay his bills. We cannot say the chancellor erred in determining that this factor was outweighed by Horne's own admission that her father was fiercely independent and had a mind of his own. Even were we to agree with Horne that this evidence ipso facto indicates that "Hood did not receive independent advice regarding his financial matters," as set out previously, other evidence indicated that Hood handled his own business affairs.
¶ 17. Moreover, Kelly is distinguishable from the case at bar. The chancellor in Kelly "found as fact, that . . . Mrs. Windham relied upon Kelly exclusively to make all her business and financial decisions and to conduct her business affairs." Id. at 819. Kelly did not challenge this finding on appeal, and this finding was "fully supported by the evidence." Id. Moreover, Mrs. Windham's attorney was unable to render her meaningful advice on the transaction. Id. at 821. There were no such findings here. There was no evidence that Hood exclusively relied on Few's advice, nor was there evidence that she ever gave any. The only evidence was that he was strong minded and handled his own business affairs, even if Few helped him pay his bills. Since there is substantial credible evidence to support the chancellor, we must affirm this issue.
III. Should a constructive trust be placed upon the homestead?
¶ 18. Horne also argues that a constructive trust be placed on the property. Essentially, she maintains that the Parkers were given the property because Hood trusted Bernie to carry out his wishes. She asserts that there is no evidence of what those conditions are so we should find those conditions were not carried out and thus place a constructive trust on the homestead. The Parkers argue the constructive trust argument is waived for failure to plead it below.
A. Waiver
¶ 19. The constructive trust argument is not waived. Although Horne did not plead constructive trust, it was the Parkers that introduced the evidence of a constructive trust. Bernie's testimony indicated clearly that the deed was not an unqualified gift, but rather was given because Hood trusted Bernie to carry out Hood's wishes with regard to the property. At the close of the evidence, the chancellor noted this fact and asked the parties to brief the issue of constructive trust. Horne then moved to amend the pleadings to conform to the evidence.
¶ 20. When evidence outside the pleadings is offered at trial, and the other side consents, the complaint is amended by operation *949 of law. M.R.C.P. 15(b). In this instance, the Parkers are not "the other side," rather they are the side that introduced the evidence. When the Parkers introduced the evidence, and Horne did not object, the pleadings were amended by operation of the rules of civil procedure. Even were we to consider the Parkers "the other side," because the evidence favored Horne's pleadings, we must find the Parkers consented, since they were the ones who introduced it. Therefore, the question of constructive trust is properly before this Court.
B. Constructive trust
¶ 21. Constructive trust is a means by which one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs. In re Estate of Horrigan, 757 So.2d 165, 170(¶ 25) (Miss.1999). "Such a trust arises by implication from the relationship and conduct of the parties and may be established by parol testimony notwithstanding the statute of frauds." Id. "It is the relationship plus the abuse of confidence that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." Thornhill v. Thornhill, 905 So.2d 747, 753(¶ 18) (Miss.Ct.App.2004) (quoting Davidson v. Davidson, 667 So.2d 616, 620 (Miss.1995)). A constructive trust:
arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.
Sojourner v. Sojourner, 247 Miss. 342, 353, 153 So.2d 803, 807 (Miss.1963) (quoting 54 Am.Jur. Trusts, § 218). "An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one." Id. at 354, 153 So.2d at 807-08. "A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship." Id., 153 So.2d at 808.
¶ 22. On appeal, the Parkers do not dispute the existence of a confidential relationship. However, we find no abuse of confidence. Horne argues that Bernie was vague and would not testify what he was supposed to do with regard to the property. In fact, Bernie did testify about what he was obligated to do. Moreover, the evidence is that Bernie kept up his end of the bargain. He let Hood remain in the house until he died. The Parkers paid the insurance and taxes, and gave some of Hood's personal property to Few. There was no evidence that Bernie did not help maintain the property during Hood's lifetime. In fact both Hood and the Parkers would help take care of each others' gardens. Finally, Hood was cremated per his request.
¶ 23. We find that this issue has no merit.
¶ 24. THE JUDGMENT OF THE CHANCERY COURT OF MARION COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.