EUCLID-MISSISSIPPI,
A DIVISION OF TRIPPEER ORGANIZATIONS, INC. *v.*
WESTERN CASUALTY & SURETY COMPANY

No. 43059 May 11, 1964 163 So. 2d 904

*Green, Green & Cheney,* Jackson, for appellant.

*Cox, Dunn & Clark,* Jackson, for appellee.

ETHRIDGE, J.

This is against the surety on a contractor's performance and payment bond. It is a consolidation of

two actions by Euclid-Mississippi, A Division of Trippeer Organizations, Inc. (called Euclid), the appellant, against Western Casualty & Surety Company (called Western Casualty), on two bonds for highway construction projects in Covington and Forrest Counties, Mississippi. The contractor was R. G. Brown, Jr. & Company, a partnership (called Brown).

The principal question is whether the surety is liable to a conditional vendor for the balance due by the contractor-vendee (or the rental, or depreciation plus cost of repairing after repossession) of expensive, heavy construction equipment used on the public work, but which upon completion would become part of the contractor's permanent capital plant, and would serve other contracts as well. We hold that the surety is not so obligated under the Mississippi bond statute.

A minor issue pertains to the amount of the surety's liability for operating repairs made by Euclid to this equipment prior to repossession. The Chancery Court of Hinds County (First District) held that Western Casualty was not liable to Euclid for the balance of the purchase price of this long lived equipment, but gave it a decree of $962.89 for repairs and parts furnished before repossession. We affirm the trial court.

The pertinent statute provides that the project's bond shall be conditioned ''for the prompt payment of all persons furnishing labor, material, equipment and supplies therefor.'' Miss. Code 1942, Rec., § 8041.

Brown had contracts with the State Highway Department for certain highway construction, one job being in Forrest and the other in Covington County. Western Casualty executed surety bonds for performance and payment under the provisions of section 8041. Euclid sold to Brown under conditional sale contracts five Euclid scrapers and one tractor. In each instance a part of the agreed purchase price was deferred for payments in monthly installments over a period of 36

months. This was large and expensive equipment. Its combined price was $272,921.90 plus finance charges, reflecting an average cost price to Brown of $54,584.38 per unit before finance charges. The sales were made in 1958 and early 1959. Brown defaulted of his installment payments, went into bankruptcy, and all of the equipment was repossessed in June 1960 by Euclid under the security provisions of the conditional sales contracts. After repossession Euclid overhauled and reconditioned the equipment for resale, and sold three of the five scrapers. It retained ownership and rented out the remaining units to other persons. The evidence reflects that these machines were used in part on the two highway construction projects involved in this litigation, and on other jobs. However, Euclid's evidence is not sufficient to show the extent and percentage of their use on the two projects in question.

The evidence is in conflict on the probable useful life of this heavy equipment. Brown testified that both the tractor and the scrapers had a minimum life-use expectancy of ten years. Calvert, Euclid's service manager, stated the life of a tractor is six to eight years, but Hopkins, a witness for complainant, said a tractor's life is about three years. In denying the claim for the unpaid balance of the purchase price of this heavy equipment or rental or depreciation on the jobs, the chancery court necessarily found that it was not used and consumed substantially on the jobs in question; and that it is long lived, and, under proper repair conditions, could be used by the contractor in future years on many other projects. We think it was manifestly correct in denying any recovery for the tractor and scrapers.

The general rule on this issue and the reasons for it are well stated in 43 Am. Jur., Public Works and Contracts, § 185, in this manner:

"Generally, the bond of a contractor for public improvements conditioned for the payment of materials

used in the execution of the contract is designed for the protection of those who furnish materials which either enter into or become a part of the improvement or are naturally consumed in the course of its construction; therefore, it does not ordinarily include tools, machinery, and appliances which, although employed in the work, are of such nature that they may survive performance of the contract in question and can be used upon other contracts, for the contract presupposes that the contractor has and will furnish upon his own account the necessary tools, implements, and appliances with which to perform the work. . . . It is not intended to permit the contractor to begin a job with a run-down outfit and have it rebuilt at the expense of his sureties. Even though literally a statute requiring bonds of contractors for public work may reach the cost of equipment which is purchased by the contractor and used on a given work and, upon the completion of the work, becomes part of his permanent and general equipment and will serve other contracts as well, it is, as a rule, construed not to include claims for such equipment. The reason for the preferment of the materialman whose material has been incorporated in a public building and placed beyond any possibility of recovery or repossession does not apply to the manufacturer or dealer who supplies an appliance which never loses its identity and never becomes an integral part of the public building. The underlying equities require discrimination between labor and materials consumed in the work or in connection therewith and those made use of in furnishing the so-called contractor's plant, and available not only for the particular contract but for other work.''

 █ In other words, the bond for a public improvement is designed for those who furnish materials which either enter into and become a permanent part of the improvement, or are naturally consumed substantially in the course of its construction. █ Hence it would

not include heavy construction machinery which, though employed in the work, survives in substantial part its performance and can be used upon other contracts by the contractor. Annos., 43 L.R.A. (N.S.) 162 (1912), L.R.A. 1915F, p. 951 (1915); see also Cohen, Public Construction Contracts and the Law (1961) 207.

Even under the federal Miller Act, which is liberally construed, "permanent equipment purchased by a contractor, no matter how small, is not covered by the bond, since it constitutes a capital expenditure, and its use is not confined to the prosecution of the bonded work." 40 U.S.C.A., §§ 270a-270e; Anno., 79 A.L.R. 2d 843, 850 (1961). Illinois State Toll Highway Commission v. M. J. Boyle & Company, 38 Ill. App. 2d 38 (App. Ct., 1962), cited by appellant, is not pertinent, since that bond went "much further than the statute" required, and the complaint alleged that the machinery would be substantially consumed by its use on the contract.

There is no decision from this state dealing with this specific question, but two indicate approval of the almost universal rule discussed above. Shuptrine v. Jackson Equip. & Serv. Co., 168 Miss. 464, 468, 150 So. 795 (1933), held that the statutory bond under what is now Code 1942, § 8041, rendered the surety liable for rental by a subcontractor of a crane with dragline equipment for use in highway construction. However, this limitation was indicated:

"How far the word 'equipment' renders the bond liable for expensive machinery purchased by the contractor with which to do the work contracted for, and which may be used thereafter for the same purposes under other construction contracts, is not now before us, and we express no opinion thereon, for if the word means anything, it must be held to include rental on such equipment for the time it is used under the contract."

Linde Air Products Co. v. American Surety Co., 168 Miss. 877, 152 So. 292 (1934), was a suit on a contractor's surety bond for construction of a gas pipeline. Code section 8041 was not involved. The bond provided that it would pay all persons "who perform labor or furnish equipments, supplies and materials for use in the work under the contract." The bond went beyond the general statutory provisions. § 374. The claims were allowed "for necessary repairs to the contractor's equipment and for the purchase of new tools and machinery necessary to enable the contractor to do the work contracted for." The opinion then stated:

"That some of the machinery would outlive the construction of the pipe line is here of no consequence. It may be, as to which we express no opinion, that unnecessarily expensive and long lived machinery would not be within the bond's obligation, but we are not presented with that question here, it not appearing that the machinery purchased was of that character."

The opinion in *Linde Air Products* does not indicate the types of "new tools and machinery" purchased. However, the court stated definitely that they were not "unnecessarily expensive and long lived." Apparently they were substantially consumed on the job. On the other hand, the scrapers and tractor in the instant case would not be substantially used and consumed on the projects, and were expensive and long lived. Cf., Seaboard Surety Co. v. Bosarge, 226 Miss. 482, 84 So. 2d 517 (1956) (bond for public housing included fuel and necessary repairs to the contractor's vehicles on job).

A pertinent leading case is Clifton v. Norden, 178 Minn. 288, 226 N.W. 940, 67 A.L.R. 1227 (1929), which held there may be recovery on a public contractor's bond for material and labor used and incidental in current repairs of the contractor's machinery, but there can be none for major repairs involving replacements of old with new parts, in the absence of proof that the

new parts were substantially consumed in the work covered by the bond. The court said:

"The law was not intended to permit a contractor to go on to a bonded job with a rundown outfit and have it rebuilt at the expense of his sureties. Public contracts require the contractors to furnish their own equipment. ... The determinative distinction is between items going into the work, or contributing to its execution and nothing else, and those 'properly chargeable to general plant and equipment of the contractor' and so available not only for the pending work but for others also." The purpose of the law is "to protect only those who furnish things for the job covered by the bond and not those who sell the contractor things which go into his general plant and will serve him not only upon the job in hand but such succeeding ones as he may undertake." To the same effect are Mack International Motor Truck Corp. v. Western Surety Co., 194 Minn. 484, 260 N. W. 869 (1935); Motor Power Equip. Co. v. Park Transfer Co., 188 Minn. 370, 247 N.W. 244 (1933); Carpenter v. Susi, 152 Me. 1, 121 A. 2d 336 (1956); Rhodes v. Riley, 113 W. Va. 679, 169 S.E. 525 (1933); Kline v. McMeekin Const. Co., 220 S.C. 281, 67 S.E. 2d 304 (1951); Western Cas. & Sur. Co. v. Fulton Sup. Co., 60 Ga. App. 710, 4 S.E. 2d 690 (1939); Moore v. Standard Acc. Ins. Co., 48 Ga. App. 508, 173 S.E. 481 (1934); and Yancey Bros., Inc. v. American Sur. Co. of N. Y., 43 Ga. App. 740, 160 S.E. 100 (1931).

In summary, the practically universal rule followed by the courts, under statutes somewhat similar to Mississippi Code section 8041, is that the surety is not liable to a conditional vendor for the balance due by the contractor-vendee on expensive, heavy construction equipment which will not be substantially used on the bonded project, but which upon completion will become part of the contractor's permanent capital plant, and will serve other contracts as well. Section 8041 covers "labor,

material, equipment and supplies *therefor"*, namely, equipment for the bonded project.

To allow recovery on a bond for purchased equipment which is not substantially consumed on the job would include capital investments by the contractor in his basic plant. The items here are long lived, with a useful life expectancy of ten years or more. A contractor who had to rent such equipment for several thousand dollars a month would not be able to compete in the market. If he survived, the excessive cost would be passed on to the public agency, to the detriment of the public interest. Certainly a contractor could not secure a performance bond without demonstrating that he owned in substantial part the plant and equipment required to do the work. Accordingly rental of such equipment is confined generally to emergencies, or supplemental units or specialized items which are not used for long periods of time in the contractor's regular plant. Allowing rental of equipment under these circumstances, as in *Shuptrine,* is entirely different from imposing liability for a contractor's capital investments in his basic plant. Moreover, day to day repairs to keep the equipment operating on the job are covered, under section 8041, as in *Linde Air Products* and *Bosarge.* Yet where major replacements or improvements to machinery are involved, these may take on the characteristics of new equipment acquisitions, inconsistent with the concept of operating repairs for which liability exists.

The dividing line between allowable and non-allowable categories under section 8041 may have to be closely drawn in many instances. However, in the present case the tractor and five scrapers were not substantially consumed on the projects in Covington and Forrest counties, but they constituted expensive, long-lived additions to Brown's capital plant. The balance due on the purchase price is not "equipment" for the project in question for which the surety is liable. The same

reasons and conclusions apply to appellant's alternative contentions of liability for rental or depreciation on the projects. Brown purchased this equipment. He did not rent it, and even if he had, the statute would not apply to these items under the present facts.

■ ■ The trial court rendered judgment for Euclid against defendant for repairs and parts furnished prior to repossession in the amount of $962.89. Without detailing the evidence on the three invoices and the defenses pertinent to them, it is sufficient to state that the record supported the chancellor's decree. Certainly we cannot say he was manifestly wrong. Subsequently, and during the same term of court, Euclid filed a motion to reopen the case, asserting that since the trial it found in its files a letter from Brown in which he recognized a partial obligation for a particular invoice, and that in fact the decree for repairs should have been for approximately six hundred dollars more than that actually rendered. Euclid also filed a petition to be allowed to file a bill of review. The court overruled both.

■ ■ The right of a litigant to have a decree reopened after trial for a rehearing is generally within the sound discretion of the chancellor. Helbig v. Cooper, 200 Miss. 282, 25 So. 2d 404 (1946). ■ ■ In order to reverse his denial of a rehearing, it must have constituted an abuse of discretion. Williams v. Henze, 216 Miss. 195, 62 So. 2d 212 (1953). ■ ■ Somewhat similar rules apply to a petition for leave to file a bill of review, which is not favored in equity, especially on the ground of newly discovered evidence. The court must have abused its discretion. In this respect, a petition may be denied where a party has not exercised due diligence. Ford v. Commercial Securities Co., Inc., 220 Miss. 157, 70 So. 2d 525 (1954).

■ ■ Defendant's answer denied that it owed the amount of the invoice, and asserted that Euclid was

under a duty to maintain the tracks on the machine. Near the top of the invoice, somewhat dim, was "Paid 8/31/59." Brown's duplicate had no obliteration, contained the same words, and also "no agreement." The court disallowed this item. Liability for this invoice was in issue under the pleadings. The letter from Brown to Euclid, on the basis of which a rehearing was asked, was in Euclid's possession. Apparently the trial court concluded appellant had not exercised due diligence in obtaining and producing it during the trial, if it was relevant.

Moreover, even if this letter had been in evidence, the court would have before it also Brown's testimony that Euclid guaranteed him satisfaction on this equipment, and advised him it would replace the track system completely if there was any difficulty with it; and Brown's duplicate invoice reflecting payment, which the trial court found was written by an agent of Euclid. In other words, the chancellor could have concluded that the letter would not affect the result anyway. For these reasons, we cannot say the trial court abused its discretion in denying a rehearing and bill of review.

Affirmed.

*Kyle, P. J., and Rodgers, Brady and Patterson, JJ.,* concur.