447 So.2d 1272 (1984)
Cornelius T. SHAW, Administrator of Estate of Ellis Ladnier, Deceased and Anna Ladnier, Deceased,
v.
Clifton E. LADNER and Gloria F. Ladner.
No. 54128.
Supreme Court of Mississippi.
February 22, 1984.
Charles E. Wood, Lindsey & Wood, Gulfport, for appellant.
Oscar B. Ladner, Gerald R. Emil, Gulfport, for appellees.
Before ROY NOBLE LEE, P.J., and HAWKINS and DAN M. LEE, JJ.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Chancery Court of Harrison County wherein the chancellor decided that the appellees, Clifton E. Ladner and Gloria F. Ladner, have proven by clear and convincing evidence that an express oral contract existed between themselves and Ellis Ladnier and Anna Ladnier, both deceased. The chancellor determined that the contract for compensation was in exchange for the Ladners' services to the Ladniers while the latter were living. The chancellor awarded each of the appellees $60,175 for their claim. From that decision the appellant, Cornelius T. Shaw, Administrator of the Estate of both the Ladniers, brings this appeal. Shaw argues that the chancellor erred (1) in finding that a contract existed, and (2) in awarding damages without a reduction from that sum of the total amount of benefit received by the Ladners.
On August 5, 1981, Ellis Ladnier died. Only a few hours later on August 7, 1981, Anna M. Ladnier, Ellis's widow, departed this world. The petition for letters of administration was filed in the Chancery *1273 Court of Harrison County by Cornelius Shaw on August 11, 1981. A decree granting that petition was entered and the letters were filed August 24, 1981. Following that, the appellees, Clifton E. Ladner and Gloria F. Ladner, husband and wife, filed a claim against both estates alleging that they were entitled to $190,340. In support of their claim they filed an affidavit alleging that there was an express agreement between themselves and the deceased Ladniers which provided that in exchange for care and services during the life of the Ladniers the Ladners would receive all the Ladniers' property at the latter's death. Cornelius Shaw entered an answer denying this claim.
At trial, the Ladners presented the testimony of five disinterested parties in addition to that of Gloria Ladner. Each of the witnesses told essentially the same story. All testified that some five to seven years before the Ladniers' death the Ladners began to care for them. The Ladniers were infirm for several years prior to their death and the Ladners cared for them in every way possible. The Ladners supplied services which ranged from bathing, cooking, cleaning, gardening, feeding, shopping, taking the Ladniers to the doctor, changing their clothes, making every piece of clothing worn by Anna Ladnier, helping them use the bathroom and even holding Mr. Ladnier's coffee cup for him every time he wanted a drink.
All five of the disinterested witnesses testified that they had been repeatedly told by both Ellis and Anna Ladnier that everything they owned was going to be given to the Ladners because the Ladners took care of them. In fact, the Ladniers had refused to sell or give away certain portions of their property, both real and personal, because they said that it belonged to the Ladners. Several of these witnesses testified that these statements were made in the presence of the Ladners. All of them testified that they knew that the Ladners expected to receive the Ladniers' property upon the latter's death.
Gloria Ladner testified that an express contract existed between the Ladniers and the Ladners. "They told us that they were both getting old and what they had, that they had a little bit of money in the bank, and their property, and Aunt Anna had had cancer many years ago and they were both in bad health and said they might need their money for medical bills and hospital bills and whatever but if we would stay there and take care of them and look after them that at their death, everything they owned would go to me and Clifton." Gloria stated that she was unable to hold any other job because of the amount of care required to tend the Ladniers. In fact, every other witness testified that care of the Ladniers was at least a full time job for one person.
In reply to the Ladners' evidence, Cornelius Shaw introduced the deposition of Lora Ladner. A reading of this deposition makes it clear that Lora Ladner was not in good health at the time the deposition was made. Also, Lora repeatedly stated that she was not sure of anything that she was testifying to. Review of her deposition gives the certain indication that her mind was less than clear at the time she gave her testimony. She summed up her testimony by saying, "Yes, I'm telling both of you lawyers, I can't prove any of it." When asked "You didn't know what was going on inside, who was doing what inside the house?" She replied, "That's right, that's right." Therefore, Lora Ladner's deposition was of no value in this case. Regardless, the sum and substance of her testimony was that Clifton and Gloria Ladner had cared for the Ladniers for sometime, but that Mr. Ladnier was good to all of his nephews.
Cornelius Shaw then testified on his own behalf. He stated that he had known his Aunt Anna all of his life. He also stated that his Aunt Anna had told him that if Ellis survived, he was going to give everything to Cousin Berniece Ladner, and if Anna survived she would give everything to Shaw. Cornelius stated that he never spoke with Ellis about the matter. When asked about an occasion in which Shaw *1274 took Anna to New Orleans to a hospital and left Ellis behind, Shaw stated that he knew Ellis would be all right because Clifton Ladner was "supposed" to care for him. When pressed, Shaw admitted that he only went around the Ladnier's house approximately once a month and had absolutely no knowledge of their daily life. He did not know who fed them, clothed them, shaved them, or assisted in any of their affairs of their day to day living.
Following the taking of all of this evidence, the chancellor issued an opinion in which he found that the Ladners had proved by clear and convincing evidence that there was an express contract for compensation. He also found that the Ladners had proved by clear and convincing evidence that they had performed the vast majority of the necessary care for the Ladniers from sometime in 1974 or 1975. Because the date that they had begun performing these services was unclear, the chancellor found that it initiated on January 1, 1975, and ended on August 7, 1981, when Anna died. The chancellor also found that the care for the Ladniers required one person full time every day. Therefore, the chancellor ruled that the amount of compensation would be determined by figuring one person ten hours per day at $5.00 per hour. This sum was to be divided equally between the Ladners. The total, $120,350 divided equally between the Ladners came to $60,175 each. Final judgment was entered accordingly.
Shaw first argues on appeal that the chancellor's finding was not supported by clear and convincing evidence and that the chancellor was manifestly wrong. This Court's standard of review regarding a chancellor's finding of fact requires that this Court determine that the chancellor was manifestly wrong and against the overwhelming weight of the evidence before it will reverse. Richardson v. Riley, 355 So.2d 267 (Miss. 1978).
In the instant case this Court would be hard pressed to state that the chancellor was manifestly wrong. Aside from Gloria Ladner's unrebutted testimony that there was indeed an express contract between the parties, the Ladners produced a number of witnesses who substantiated that claim. Those witnesses testified that they knew the Ladners expected the property and that the Ladniers had every intention of giving it to them. Indeed, the Ladniers had refused to part with some of their property, both real and personal, because they believed that it belonged to the Ladners in exchange for caring for them. The Ladniers had told all of the witnesses that the Ladners would have their property.
Cornelius Shaw was unable to rebut any of that testimony. His statement that Anna Ladnier had promised the property to him was unsupported by any other witness and is not sufficient upon which to find that the chancellor was manifestly wrong. Therefore, the chancellor's finding that an express contract existed between the parties is affirmed.
Shaw's second assignment of error relates to the chancellor's method of computing damages. Essentially Shaw argues here that all of the benefits incurred by the Ladners while working for the Ladniers should be considered and deducted from any sum awarded to the Ladners. Shaw argues that there was only a quasi contract if there was any at all and that the appellants' use of the home, use of the land, and sale of crops must necessarily be deducted to arrive at the reasonable value of the services rendered.
Shaw's argument fails because it neglects to consider that the nature of the contract required that the Ladners stay in the Ladniers' home. There was no other way in which the Ladners could have cared for the Ladniers as they did. Also, it was not clearly established that the Ladners received any material benefit from using the land or selling crops. Therefore, in the absence of any proof that the Ladners received any benefit not contemplated by the contract, the chancellor was under no duty to reduce the award of damages by the reasonable value of those benefits.
*1275 In Wells v. Brooks, 199 Miss. 327, 24 So.2d 533 (1946), a factual situation was presented very similar to the one at bar. There, this Court held:
The pay expected by Wells  that is transfer in some manner to his wife or to his wife and himself by Miss Fowler of the title to her property  cannot be enforced, but that does not mean he is entitled to and cannot recover the reasonable value of the services rendered in the rightful expectation of such transfer. This Court has held a number of times that in such cases the claimant is entitled to fair and adequate compensation on a quantum merit basis.
199 Miss. at 335, 336, 24 So.2d at 536.
The chancellor in the instant case fashioned his remedy just as this Court dictated in Wells that he must. Although he could not have forced title to the property to be transferred to the Ladners, the chancellor allowed compensation designed to be both fair and adequate on a quantum merit basis.
Therefore, based on all of the foregoing, the decision of the chancellor is hereby affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.