460 So.2d 811 (1984)
Gayle O. KELLY and Iris Kelly
v.
David SHOEMAKE, Admr., C.T.A., Estate of Zetta K. Windham, et al.
Gayle O. KELLY
v.
David SHOEMAKE, Admr., C.T.A., Estate of Zetta K. Windham, et al.
Nos. 55134, 55135.
Supreme Court of Mississippi.
November 21, 1984.
As Modified on Denial of Rehearing December 12, 1984.
*814 James Leon Young, Gee Ogletree, Young, Scanlon & Sessums, Brandon, on appeal only, for appellants.
Walker L. Watters, Thomas R. Hudson, William C. Brabec, Gerald, Brand, Watters, Cox & Hemleben, Jackson, Wallace Allred, Collins, for appellees.
Before ROY NOBLE LEE, P.J., and HAWKINS and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:

I.

A.
This appeal arises from decrees of the Chancery Court of Covington County removing Gayle Kelly as administrator of the estate of Mrs. Zetta K. Windham, setting aside various deeds, codicils, and transfers of funds on the ground that Kelly exercised undue influence over Mrs. Windham, and rendering a judgment in favor of the estate for $1,194,972.39 against Kelly for failure to satisfactorily account for and return funds belonging to Mrs. Windham's estate. From these decrees, appeal is taken with the following errors alleged to have been committed by the chancellor:
1. Failure to credit the overwhelming weight of the evidence that an express oral contract existed between Kelly and the Windhams whereby they would transfer all they owned to him in return for his rendering personal services to them in their old age.
2. Misapplying the law of undue influence to subsequent transactions between the Windhams and Kelly rather than to the time of the abovementioned agreement.
*815 3. Abusing its discretion in refusing to reopen the case to hear testimony that would have fully and fairly presented Kelly's case.
4. Misapplying the law of estoppel to bar Kelly from claiming any right to the proceeds from the sale of Windham properties to which he held an unrecorded deed.
5. Removing Kelly as administrator of the estate and rendering a judgment against him for any sum whatever.
We have carefully reviewed the voluminous evidence in this case and the arguments by both sides and we conclude that none of the errors assigned by Kelly has merit. We affirm the chancellor's decrees in all respects.

B.
We summarize the basic facts of the fourteen year relationship between the Windhams and Gayle Kelly below; additional facts will be developed as needed in the discussion of law.
R.L. and Zetta Windham were a childless, elderly and wealthy couple living in Collins, Mississippi. In 1964, they executed mutual wills providing for equal division of their wealth between their respective families. In 1966, their nephew, Gayle Kelly, came with his family to live on the Windham property and from that date forward he and his wife were at the disposal of the Windhams to perform whatever tasks were required. In 1974, R.L. Windham sold his considerable oil and gas holdings to Wiley Fairchild for approximately $2,180,000. After Mr. Windham's death in 1975, Kelly continued to render the usual services but also began to manage Mrs. Windham's business affairs.
From 1975 until her death in 1978, Mrs. Windham executed codicils appointing Kelly as executor and disinheriting anyone who contested the will, with the forfeited share passing to Kelly. Mrs. Windham's checking and savings accounts were changed to make Kelly a joint tenant, as were her certificates of deposit. Kelly withdrew large sums of money, and changed a million dollar certificate of deposit to his own name, while she was hospitalized. After her death, appellant recorded four deeds conveying to him all interests in the Windhams' properties. He produced two and three million dollar checks signed by Mr. Windham to prove the existence of an express oral agreement in 1965 between the Windhams and himself whereby he would receive all of their fortune in return for coming to live and care for them in their declining years. Kelly was cited to produce the will and codicils of Mrs. Windham in 1979, and after a three-year discovery process and oft-delayed trial, the chancellor entered the decrees rejecting his claims and ordering repayment of Windham estate funds to be distributed according to the terms of the 1964 will.

II.

WAS THE CHANCELLOR'S REFUSAL TO REOPEN THE CASE REVERSIBLE ERROR?
The chancellor refused to reopen the case to hear testimony of three witnesses overlooked by Kelly's trial counsel but granted leave to take their depositions which are included in the record on appeal.
It is well settled that a chancery court has the authority to reopen a case for additional proof. Hamilton v. McGill, 352 So.2d 825, 830 (Miss. 1977). In Griffith, Mississippi Chancery Practice, § 595, pp. 631-32 (2d Ed. 1950), cited in Hamilton, it is said:
... it has long been the settled rule in our courts of equity that where on a final hearing or even after submission it is clearly perceived that some material point is either left unproved or the explanation of it is insufficient the chancellor has the discretion in the interest of justice and merits to remand it to the docket for further proof.
In Griffith, supra, § 632, p. 690, it is stated:
It is the earnest desire of courts, and especially of courts of equity, to render decision only upon a full and fair exposition *816 of all the pertinent material facts, and the court will always be interested in any presentation that discloses any material fact not theretofore brought into the case. Nevertheless the law requires diligence from suitors, and when a trial has been had the question is not always whether justice has been done but whether the party complaining could, by the exercise of proper diligence, have produced a different result.
The right of a litigant to have a case reopened for additional testimony must necessarily be left largely to the sound judicial discretion of the chancellor. Euclid-Mississippi v. Western Casualty and Surety Company, 249 Miss. 779, 163 So.2d 904, 908 (1964). The chancellor's decision should reflect a proper balance between administering full justice in an individual case and maintaining a prompt, efficient and orderly administration of justice, free from inexcusable negligence by the parties. See Griffith, supra, § 632 at 691.
In this case, appellants had over three years to complete the discovery and the trial lasted for five days during two court terms. Kelly called fifteen witnesses to substantiate his claim. His motion to reopen the case came three weeks after the court rendered a bench decree adverse to him but before entry of the final decree. The question is whether the chancellor abused his discretion in denying appellant's motion to reopen the case.
When the litigation in a will contest is so protracted as in the case at bar, considerable deference should be given to a chancellor's exercise of discretion not to reopen the case. Having had three years of discovery and a five-day trial, it would appear that the equities favor enforcing a prompt, efficient and orderly administration of justice. Moreover, the testimony of the three witnesses that Mr. and Mrs. Windham expressed their desire to have Kelly inherit their estate conforms to testimony already offered by other witnesses for Kelly during the trial. A motion to reopen the case to receive newly discovered evidence may be denied when the new evidence is merely cumulative. Allman v. Gulf and S.I.R. Co., 149 Miss. 489, 506, 115 So. 594 (1928).
We, therefore, conclude that the chancellor reasonably exercised his discretion in refusing to re-open the case to hear the witnesses' testimony because the lengthy discovery and trial period point in favor of a prompt, orderly, and efficient administration of justice. Moreover, we find that no reversible error resulted from excluding their testimony because it was cumulative.

III.

WAS THE CHANCELLOR'S REFUSAL TO FIND AS A MATTER OF FACT THAT AN EXPRESS ORAL AGREEMENT EXISTED BETWEEN THE WINDHAMS AND KELLY IN 1965, AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

A.
The chancellor's findings of fact reflected that the 1964 mutual wills of R.L. and Zetta Windham accurately reflected that each of them and both of them intended to divide their property equally between the two families. Having made this finding, the chancellor by inference had to have found that there was no agreement between the Windhams and Gayle Kelly in which he alone would receive all of the substantial Windham estate. Kelly challenges this implied finding of fact as against the overwhelming weight of the evidence. Kelly faces a difficult task on appeal. Not only must he show that at trial he introduced clear, definite, and certain evidence to prove the existence and terms of the alleged oral contract, he must show that the chancellor's failure to credit his proof is not supported by substantial evidence and is manifestly wrong.
To enforce an oral agreement to devise property, Kelly has the burden to establish the existence and terms of the agreement by evidence which is "clear, definite and certain." Shaw v. Ladner, 447 *817 So.2d 1272, 1274 (Miss. 1984); Voss v. Stewart, 420 So.2d 761, 464 (Miss. 1982); Kalavros v. Deposit Guaranty Bank and Trust Co., 248 Miss. 107, 114, 158 So.2d 740, 743 (1963); In Re Boyd's Estate, 228 Miss. 526, 532, 87 So.2d 902, 904 (1956); In Re Reinecke's Estate, 225 Miss. 376, 381-82, 83 So.2d 438, 440 (1955). Clear, definite and certain evidence must establish both components of the alleged contract, its existence and its terms or scope.
Sound policy reasons were enunciated in In Re Boyd's Estate, supra, for requiring a high burden of proof to establish claims such as Kelly's.
The terms of a contract of this kind must be clear, definite, certain, and complete. [Citations omitted]. We can not say the chancellor was manifestly wrong in finding that there was no contract. It is difficult to see how he could have found otherwise. For this Court to hold that under this proof the chancellor should have found the existence of a contract (assuming, but not deciding, that it was enforceable) would be to place the devolution of property upon a shaky foundation, encourage litigation in estates, and put a premium on flimsy claims to estates of the dead.
Id. 228 Miss. at 532-33, 87 So.2d at 904.
The chancellor, as the trier of fact, determines the question of the existence and terms of an alleged agreement to devise property. Voss v. Stewart, 420 So.2d 761, 765 (Miss. 1982). As observed in Richardson v. Riley, 355 So.2d 667 (Miss. 1978), a chancellor's
... findings of fact on conflicting evidence cannot be disturbed by this Court on appeal unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence. Even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the chancellor's findings unless manifestly wrong, as stated above. [Citations omitted].
Id. at 668. In reviewing findings of fact made by the chancellor, where there is substantial evidence supporting the chancellor's factfindings, they are beyond the power of this Court to disturb. Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983). Where the chancellor made no specific finding on an issue of fact, this Court proceeds on the assumption that the chancellor resolved all such fact issues in favor of appellee. Tedford v. Dempsey, supra; Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983).

B.

1.
Kelly argues that the chancellor must have recognized the existence of the 1965 oral agreement because the court upheld part of a 1972 deed in which the Windhams conveyed to the Kellys their home and surrounding properties, and all other real, personal or mixed property they owned. The chancellor ruled that the Kellys were entitled to the Windham homestead, based upon the unquestioned validity of the description of that property in the deed, and upon undisputed testimony from numerous witnesses, including one of the appellees in this case, that the Windhams wanted Kelly to have their home.
As for the effectiveness of the 1972 deed to convey to Kelly all other property owned by the Windhams, the chancellor heard and was entitled to credit testimony from the contestants' documents expert that cast serious doubt upon the validity of the "all other property" clause. The document expert stated that, in his opinion, the description in the 1972 deed originally ended with a period after the description of the Windham home property. At a later date, the deed was reinserted with imperfect alignment, the period was supplanted by a comma, and the "all other property" clause was typed in.
Although Kelly maintains that the Windhams gave him the deed to all of their property in 1972, he admitted that the document conflicted with later warranties given by the Windhams in the sale of their *818 oil and gas properties to Fairchild in 1974, which Kelly himself notarized. Other testimony was offered by Kelly to prove that the Windhams openly recognized Kelly's ownership of their entire estate, and by the contestants to prove that the Windhams continued to treat the property as their own. The chancellor was faced with sharply conflicting testimony and a noticeable discrepancy between the description of the Windham home property and the "all other property" clause. On the balance, we cannot say that the chancellor's resolution of the conflict against the validity of the "all other property" clause is not supported by substantial evidence. We conclude that the chancellor's partial upholding of the 1972 deed does no more than recognize the Kellys' legitimate and basically unquestioned claim to the Windham homestead property. The chancellor's refusal to credit the "all other property" clause is supported by substantial evidence. The 1972 deed, viewed in this light, does not constitute clear, definite, and certain evidence of the alleged oral agreement.

2.
Kelly also relied upon two checks signed by Mr. Windham in the amounts of two and three million dollars bearing the references "agreement" and "reafirm (sic) 1965 agreement," as proof of the agreement. The chancellor did not directly address the validity of these checks except to note that the Kellys had not probated them as a claim against the estate of either Mr. or Mrs. Windham. Kelly asserted that Mr. Windham gave him the two million dollar check in 1966, shortly after Kelly moved to Collins in furtherance of the agreement. The three million dollar check, Kelly claimed, was given to him shortly after Mr. Windham closed the Fairchild sale.
Although the chancellor made no express finding to this effect, there was considerable evidence suggesting that in fact Mr. Windham did not draw these checks for Kelly. Two witnesses, including one disinterested party, testified that Mr. Windham habitually gave signed blank checks to members of the family to purchase items, but never wrote checks for such large amounts as these two checks. Although the checks bear Mr. Windham's signature, the amounts, dates, and references are typed in. The checks are not numbered and the account on which they were drawn never held funds sufficient to cover either check. The existence of the checks was not revealed until after the Windhams were dead when Kelly was ordered to probate Mrs. Windham's will. The uncertain authorship and questionable circumstances surrounding these two checks substantially support the chancellor's refusal to recognize them as clear, definite, and certain evidence of the agreement.

3.
Kelly also contends that the oral agreement was evidenced by the fact that he was made a joint tenant on Mrs. Windham's savings and checking account and certificate of deposit, and by the fact that he later became the sole owner of a million dollar certificate of deposit. The chancellor found that Mrs. Windham did not make a gift of any of these funds to Kelly and that he had no property rights in the funds. Kelly never was named on any Windham account or certificate of deposit until after Mr. Windham's death. Kelly's dealings with the account and certificate of deposit funds occurred with little or no knowledge on the part of Mrs. Windham. Certain bank officials testified that Kelly said he was acting as trustee for Mrs. Windham in reinvesting the certificates of deposit. Finally, Mrs. Windham's federal tax returns show that she owned and received interest income from the accounts and certificates of deposit until her death, while Kelly's tax returns show him as a wage-earning employee who recognized no interest income from the certificates of deposit until after Mrs. Windham died.

4.
Kelly offered the testimony of several witnesses, including Mr. Windham's C.P.A., and Mrs. Windham's private nurse and her minister, to the effect that the Windhams *819 wanted their entire fortune to go to Kelly. Kelly and his brother, to whom Kelly lent very large sums of Windham estate funds, testified as the only witnesses to the actual verbal agreement between the Windhams and Kelly in 1965. Their testimony was contradicted by that of numerous other family relatives, all appellees in this case, and other disinterested persons, including Mr. Windham's business confidant, who stated that Kelly had only been hired by Mr. Windham because Windham knew he would have to support Kelly eventually. The sharply conflicting testimony raised a factual dispute which the chancellor as the finder of fact was obliged to resolve. In reviewing the testimony of the witnesses for both sides, we cannot confidently say the chancellor was manifestly erroneous in failing to rule that Kelly's witnesses established the existence of the oral agreement by clear, definite and certain evidence. Although Kelly's own testimony about the agreement cannot be directly contradicted, since only he, his brother, and the Windhams were allegedly present, his interest in the outcome of the case is clear and his credibility was not unquestioned.

C.
The proof in this case offers a striking comparison to the recent case of Shaw v. Ladner, 447 So.2d 1272 (Miss. 1984), in which we held that an oral agreement of the type alleged by Kelly was proven by clear, definite, and certain evidence. In Shaw v. Ladner, the proponents of the alleged oral contract introduced the testimony of five disinterested witnesses who stated that the elderly Ladniers repeatedly voiced their intentions to leave their estate to the Ladner couple in exchange for the Ladners rendering constant personal services to the Ladniers in their final years of life. 447 So.2d at 1274. The opponent, Shaw, we noted, was unable to rebut any of this testimony and his testimony that Mrs. Ladnier had promised her property to him was uncorroborated by any other witness. Id.
In the case at bar, the existence and terms of the alleged oral agreement was only established by the testimony of Kelly and his brother, both of whom have an apparent interest in this case's outcome. The documentary evidence offered to corroborate the alleged contract contains serious flaws, already outlined above, so that it must be disregarded, as was the contradictory testimony of Shaw's corroborating witness in Shaw v. Ladner, 447 So.2d at 1273. Also, Kelly's "disinterested" witnesses, the C.P.A., the lawyer, and the private nurse, had all depended previously upon Kelly to write the checks for services rendered to Mrs. Windham. The opponents to Kelly's contract, unlike Shaw v. Ladner, introduced considerable evidence in rebuttal to the existence of the contract, too lengthy to outline, but clearly sufficient and from disinterested sources.
In summary, we are convinced that upon a full review of the evidence the chancellor was not manifestly wrong in failing to recognize that the contract alleged by Kelly in fact existed.

IV.

DID THE CHANCELLOR MISAPPLY THE LAW OF UNDUE INFLUENCE?

A.
The chancellor's final decree found as a matter of fact that Gayle Kelly was in a close, personal, and confidential relationship with his aunt, Mrs. Windham. The chancellor also found as fact that, after her husband's death, Mrs. Windham relied upon Kelly exclusively to make all her business and financial decisions and to conduct her business affairs. These findings of fact are not challenged by Kelly on appeal and are fully supported by the evidence.
It is well-settled law that once the existence of a confidential relationship is proven, a presumption of undue influence arises and the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence:
(1) good faith on the part of the grantee/beneficiary;

*820 (2) the grantor's full knowledge and deliberation of his actions and their consequences, and
(3) advice of (a) a competent person, (b) disconnected from the grantee, and (c) wholly devoted to the grantor's/testator's interests.
Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984); Harris v. Sellers, 446 So.2d 1012, 1014-15 (Miss. 1984).
The law of undue influence as applied to the case at bar is that any transactions between Mrs. Windham and Kelly occurring after the death of Mr. Windham may be presumed to be void as the result of undue influence, unless Kelly shows by clear and convincing evidence that (a) he exercised good faith, (b) Mrs. Windham knew and deliberated her actions and their consequences, and (c) that she received competent independent advice. Murray v. Laird, supra; Harris v. Sellers, supra.

B.

1.
In determining whether Kelly exercised good faith in connection with the codicils, certificates of deposit, accounts, and deeds, Murray v. Laird, requires us to consider (a) the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence; (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of the instrument. 446 So.2d at 578. The proof on the question of Kelly's good faith does not clearly and convincingly establish Kelly's good faith, rather it demonstrates its absence. Kelly was active in the procurement of the codicils naming him as the executor of Mrs. Windham's estate and giving to him the portion of her estate which an heir would forfeit if he contested the will or codicils. Kelly drove Mrs. Windham to her Laurel attorney's office on every occasion and was present in the office during the execution of the first codicil. He drove her to the chancery clerk's office each time she had the other two codicils witnessed. Kelly wrote and delivered the checks to the Laurel attorney for services rendered in preparation of the codicil. Kelly also generally concealed the codicils in his possession until Mrs. Windham's death. Kelly was likewise active in the creation of the joint accounts, certificates of deposit, and deeds. He admitted that he established joint accounts and certificates of deposit without even telling Mrs. Windham. He procured a million dollar certificate of deposit in Jackson in his own name using her funds, while she lay ill in a Hattiesburg hospital. He admitted that he typed the 1975 deed conveying Mrs. Windham's property to him, the 1976 mineral right and royalty transfer, and instituted the negotiations to have the Knight heirs' property transferred to Mrs. Windham in 1977, which she conveyed to him one month later. Kelly admitted that he did not record the 1975 and 1977 deeds until three days after Mrs. Windham's death. While Murray v. Laird notes that "... prior disclosure of a donation is not a prerequisite to its validity ...", 446 So.2d at 579, the fact that Kelly concealed from all but his immediate family the codicils, deeds, accounts, and certificates of deposit reinforces the undue influence presumption. In short, there was no affirmative or positive proof that Kelly exercised good faith in these numerous transactions.

2.
In determining whether Mrs. Windham's actions were the product of a knowing and deliberate choice, Murray v. Laird directs us to consider (a) her awareness of her total assets and their general value, (b) whether she understood who were the natural inheritors of her bounty under a prior will, and how the proposed change legally affected that will, (c) whether non-relative beneficiaries would be excluded or included, and (d) her knowledge of who controls her finances and business and by what method, if controlled by another, and how dependent she is upon him and how susceptible to his influence. 446 So.2d at 579. For the last three years of Mrs. *821 Windham's life, she was frequently ill, hospitalized, and dependent upon Kelly to transact all necessary business for her, including tax and accounting matters. She depended upon Kelly to drive her to her attorney's office, to the bank, and to the courthouse. Although the Laurel attorney testified that Mrs. Windham appeared to be independent and unsusceptible of external influence, he admitted that it was his impression that she relied upon Kelly generally for advice. As for the transfer of Windham account funds, Mrs. Windham, according to Kelly's own testimony, was not even aware of his dealings with her money. It was also shown that she did not understand the consequences of the 1975 deed divesting herself of title to all her real and personal property because she continued to treat the Fairchild sale proceeds as her own property on which she paid taxes. She also told members of the Windham and Kelly families that they would be taken care of. Kelly called several witnesses who stated that Mrs. Windham was independent and uninfluenceable, while the appellees testified that she was an emotional, dependent person who was especially devoted to Kelly. In reviewing all the evidence on this issue, we conclude that Kelly did not clearly and convincingly rebut the evidence that Mrs. Windham did not act independently and deliberately with respect to the challenged transactions.

3.
Finally, in determining whether Mrs. Windham received informed independent advice from someone wholly devoted to her interests, Murray v. Laird directs our attention to whether the advisor (a) conferred with her prior to drafting the documents, (b) was given full knowledge upon which to base his suggestions, (c) was competent to advise and was wholly devoted to her interests. 446 So.2d at 579. The chancellor placed heavy emphasis on the fact that Mrs. Windham received no independent advice on any of her business or financial affairs after the death of her husband. The chancellor found as fact that she relied exclusively upon Kelly for personal and financial advice. In connection with the codicils, the Laurel attorney was unable to render meaningful advice because he did not know the extent of her assets, he never saw her tax returns, and did not question on whether the codicils were the product of a free-thinking independent mind or whether they were imposed by the dominance of an over-reaching person. Although the attorney stated that Mrs. Windham's actions were based on an independent decision, he was unaware of the antecedent circumstances leading to the drawing of the codicils and he did state that Mrs. Windham relied upon Kelly generally for advice. As to the other transactions, Mrs. Windham did not know of Kelly's dealings with her funds in many cases, so she could not have received independent advice on those matters. Kelly's own testimony was that he prepared or procured the 1975, 1976, and 1977 deed according to her directions and there was no proof of prior independent advice as to those deeds. The record reflects that Kelly did not clearly and convincingly prove that Mrs. Windham received independent competent advice on the transactions in question.
Kelly asserts that the chancellor should have restricted his inquiry as to the existence of undue influence to the time when the Windhams made their offer to him in 1965. Relying solely on Deanes v. Tomlinson, 54 So.2d 474, (Miss. 1951), Kelly argues that the law of undue influence is properly applied to the time of the initial agreement. Deanes was a sick, elderly man who offered to deed his property and will his estate to his third cousin, Tomlinson, if she would take him into her home and care for him. He later filed suit to set aside the deed on the ground of fraud and insufficient mental capacity. In addressing the question of fraud, we stated:
There was no confidential or trust relation existing between these parties. While Mrs. Tomlinson and appellant were third cousins, they had not visited each other within the past year or so. Mrs. Tomlinson neither sought nor solicited the agreement. She did not even accept *822 the proposition until two or three days after it was made. Admittedly, appellant originated the idea, and, of his own free will and accord, sought its consummation. Consequently, it is obvious that there was no fraud in this case. [Citations Omitted]
54 So.2d at 475.
Kelly argues that Deanes is precise authority for his situation because of three similar circumstances:
1. Kelly was a relative of the Windhams but had not visited them frequently prior to the agreement. Similarly, Mrs. Tomlinson had not visited Mr. Deanes within the past year or so prior to their agreement.
2. Kelly did not propose the agreement. The chancellor found that Kelly came to Collins at the request of the Windhams. Similarly, in Deanes Mrs. Tomlinson did not propose the agreement, but its idea was originated with Mr. Deanes.
3. Mr. and Mrs. Windham were mentally competent at the time of entering into the agreement in 1965. Likewise, Mr. Deanes was mentally competent at the time he had entered into the agreement and had satisfactorily taken care of his business prior to the agreement.
Under these facts Kelly contends the chancellor should have determined that, at the time the Windhams entered into the agreement with him, the parties were dealing at arms-length and acting of their own free will and accord.
Kelly's argument is without merit for two reasons. First, as noted in section III, we do not find that an oral contract to transfer to Kelly all the Windham property was entered into in 1965, so there is no factual basis for analyzing the relative position of the parties at that time. Second, even assuming arguendo that such an agreement existed, Kelly's contention asks a court to remain blind to any development of a caretaker relationship from an arms-length contract into a close, personal, and confidential relationship. Kelly asks us to ignore the fourteen-year ripening of his aunt's love for him into a condition of unqualified trust; this we will not do. Deanes v. Tomlinson, supra, does not require such a result, and Harris v. Sellers and Murray v. Laird direct us to consider the circumstances existing at the time of the transactions in question. Harris v. Sellers, 446 So.2d at 1014-15, Murray v. Laird, 446 So.2d at 578-79.
In conclusion, we rule that the chancellor properly applied the law of undue influence to the facts and circumstances surrounding each of the challenged transactions.

V.

DID THE CHANCELLOR ERR IN FINDING THAT THE KELLYS WERE ESTOPPED FROM CLAIMING ANY INTEREST IN THE WINDHAM PROPERTIES, OTHER THAN THE WINDHAM HOMESTEAD, TO WHICH THEY HELD AN UNRECORDED DEED?
The chancellor ruled that the 1972 deed was effective to convey to Kelly the Windham home property but that Kelly was estopped from claiming any interest under the "all other property" clause to the oil and gas holdings conveyed by the Windhams to Fairchild in 1974. The basis for this ruling was that although Kelly received the deed in 1972, he did not record it until August, 1979. Kelly made no mention of the deed at the time when he took the Windhams' acknowledgment on the buy/sell agreement with Fairchild in 1974, which expressly stated that there were no prior unrecorded deeds by the Windhams affecting their oil and gas holdings. Kelly subsequently made no claim to any of the properties conveyed by the Windhams to Fairchild or to the proceeds from the sale prior to the death of both of the Windhams. Kelly also did not change the tax assessment rolls to reflect his asserted ownership of the Windhams' other properties under the 1972 deed.
The fact that Kelly waited until well after Fairchild recorded his deed to the Windhams' oil and gas properties to *823 place on record his own claim under the 1972 deed bars him under our recording statute from claiming priority of title over the Fairchild deed. Mississippi Code Annotated § 89-5-5 (1972). Kelly admitted that Fairchild received no actual notice from either the Windhams or himself as to the existence of the 1972 deed.
If Kelly had had a valid claim to the proceeds of the Fairchild sale, his sole legal recourse would have been to probate a claim against either the estate of Mr. or Mrs. Windham. Mississippi Code Annotated § 91-7-51 (1972). The chancellor found as fact that he did not do so. Thus, Kelly is barred under the law from claiming the proceeds of the sale of the minerals from the funds of Mr. or Mrs. Windham's estate. Kelly's delay in asserting his claim under the "all other property" clause has resulted in the loss of the best source of proof as to the Windhams' intentions through the death of the Windhams themselves.
The chancellor relied not upon these statutes but upon the doctrine of equitable estoppel to rule that Kelly's claim against the Fairchild sale proceeds was barred. The basic elements of equitable estoppel, stated in terms of the facts of this case, are (1) the appellee's belief and reliance upon Kelly's misrepresentation that he had no claim to the Fairchild sale funds, (2) the appellee's change of position in not bringing an action to determine the intended effect of the 1972 deed as a result of the misrepresentation, and (3) detriment or prejudice to the appellees caused by their failure to settle Kelly's claim of ownership. Thomas v. Bailey, 375 So.2d 1049 (Miss. 1979). The heirs of Mrs. Windham were entitled to rely upon the land records which did not reflect until 1979 any claim by Kelly to the Windham oil and gas holdings sold to Fairchild. Clearly, if a conflict had been apparent, the heirs would have brought suit at that time to determine the true ownership of those holdings and the proceeds therefrom. Finally, the proceeds from the Fairchild sale, constituting the bulk of the Windham estate, were spent by Kelly to the true heirs' prejudice, as a result of their reliance upon his silence, which was only broken after the Windhams' deaths. Although there was sufficient statutory authority to effectively bar Kelly's claim to the Fairchild proceeds in the Windham estate, we are of the opinion that the chancellor properly applied the doctrine of equitable estoppel to likewise bar such a claim.

VI.

DID THE CHANCELLOR ERRONEOUSLY REMOVE KELLY AS ADMINISTRATOR OF THE ESTATE AND RENDER A JUDGMENT AGAINST HIM IN THE AMOUNT OF ESTATE FUNDS FOR WHICH HE FAILED TO SATISFACTORILY ACCOUNT?
The chancellor ordered Kelly to file an accounting and inventory on November 17, 1982, for the estate of Mrs. Windham pending the outcome of the trial, using as the point of beginning the figure shown on her federal estate tax return as the total gross estate, $1,818,208.12. Kelly was ordered to present accountings and inventories for the years 1978 through 1982, but none of them filed by Kelly have been ratified by the chancery court. Kelly contended that codicil no. 1 to Mrs. Windham's will waived any formal accounting by the executor. This codicil was challenged by the appellees and held void as the result of undue influence. The chancellor correctly exercised his discretion in requiring Kelly to file accountings and inventories during the pendency of the litigation in order to preserve and protect the assets of the estate.
Kelly's contentions that he should be reinstated as executor and should not be held liable for unaccounted-for estate funds are based on the premise that the chancellor erroneously failed to find the existence of the 1965 agreement and misapplied the law of undue influence to the case. As noted in sections III and IV, we affirmed the chancellor on both issues.
Mississippi Code Annotated § 91-7-277 (1972) requires that at least once a year *824 every executor present under oath an account of his administration, showing the disbursements, every item of which and the amount thereof to be distinctly stated and supported by legal voucher, and it shall also show the receipts of money and from what sources. The failure to account annually shall be a breach of the administration bond for which the executor may be removed. In this case, Kelly filed several accountings and inventories, none of which were sufficiently specific to satisfy the chancellor.
Mississippi Code Annotated § 91-7-253 (1972) provides that no executor or other fiduciary acting pursuant to the authority of any chancery court may borrow or use for his own benefit, directly or indirectly, any of the funds or property of the estate committed or entrusted to him by such court. Kelly has admitted that he has spent or lent large sums of funds taken from the Windham estate for which he is unable to account.
Mississippi Code Annotated § 91-7-285 (1972) authorizes the chancellor to remove any executor who is derelict in the performance of any duty required of him by law or orders of the court. Kelly's misconduct and misappropriation of estate funds form a sufficient basis for the chancellor to remove him as executor of Mrs. Windham's estate. As a result of the inadequate accountings, a personal judgment was rendered against Kelly for $1,194,972.39. The chancellor was manifestly correct in holding Kelly personally liable for the misappropriation of such large sums of Mrs. Windham's estate funds.

VII.

CONCLUSION
This case is affirmed on all issues raised by Kelly. The chancellor's refusal to reopen the case was a reasonable exercise of discretion under the circumstances. Kelly failed to prove the existence of the alleged oral contract with the Windhams by clear, definite, and certain evidence. The chancellor properly applied the law of undue influence to the time period of the challenged codicils and other transactions. The silence by Kelly as to any claim to the proceeds of the Fairchild sale estops him from claiming any interest under his 1972 deed. Finally, appellant's unsatisfactory accountings and misappropriation of estate funds fully supported the chancellor's decision to remove him as executor and hold him personally liable for the money missing from the estate. Finding no error, we affirm.
AFFIRMED.
PATTERSON, C.J., WALKER, and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.